## IN RE WINSHIP

No. 778.   Argued January 20, 1970—Decided March 31, 1970

*Rena K. Uviller* argued the cause for appellant.   With her on the briefs was *William E. Hellerstein.*

*Stanley Buchsbaum* argued the cause for the City of New York, appellee.   With him on the brief was *J. Lee Rankin.*

*Marie S. Klooz* filed a brief for the Neighborhood Legal Services Program of Washington, D. C., et al. as *amici curiae* urging reversal.

*Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Marie L. Marcus,* Assistant Attorney General, filed a brief for the Attorney General of New York as *amicus curiae* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Constitutional questions decided by this Court concerning the juvenile process have centered on the adjudicatory stage at "which a determination is made as to

whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution." *In re Gault,* 387 U. S. 1, 13 (1967). *Gault* decided that, although the Fourteenth Amendment does not require that the hearing at this stage conform with all the requirements of a criminal trial or even of the usual administrative proceeding, the Due Process Clause does require application during the adjudicatory hearing of " 'the essentials of due process and fair treatment.' " *Id.,* at 30. This case presents the single, narrow question whether proof beyond a reasonable doubt is among the "essentials of due process and fair treatment" required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult.[1]

Section 712 of the New York Family Court Act defines a juvenile delinquent as "a person over seven and less than sixteen years of age who does any act which, if done by an adult, would constitute a crime." During a 1967 adjudicatory hearing, conducted pursuant to § 742 of the Act, a judge in New York Family Court

---

[1] Thus, we do not see how it can be said in dissent that this opinion "rests entirely on the assumption that all juvenile proceedings are 'criminal prosecutions,' hence subject to constitutional limitations." As in *Gault,* "we are not here concerned with . . . the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process." 387 U. S., at 13. In New York, the adjudicatory stage of a delinquency proceeding is clearly distinct from both the preliminary phase of the juvenile process and from its dispositional stage. See N. Y. Family Court Act §§ 731–749. Similarly, we intimate no view concerning the constitutionality of the New York procedures governing children "in need of supervision." See *id.,* at §§ 711–712, 742–745. Nor do we consider whether there are other "essentials of due process and fair treatment" required during the adjudicatory hearing of a delinquency proceeding. Finally, we have no occasion to consider appellant's argument that § 744 (b) is a violation of the Equal Protection Clause, as well as a denial of due process.

found that appellant, then a 12-year-old boy, had entered a locker and stolen $112 from a woman's pocketbook.   The petition which charged appellant with delinquency alleged that his act, "if done by an adult, would constitute the crime or crimes of Larceny."   The judge acknowledged that the proof might not establish guilt beyond a reasonable doubt, but rejected appellant's contention that such proof was required by the Fourteenth Amendment.   The judge relied instead on § 744 (b) of the New York Family Court Act which provides that "[a]ny determination at the conclusion of [an adjudicatory] hearing that a [juvenile] did an act or acts must be based on a preponderance of the evidence."[2]   During a subsequent dispositional hearing, appellant was ordered placed in a training school for an initial period of 18 months, subject to annual extensions of his commitment until his 18th birthday—six years in appellant's case. The Appellate Division of the New York Supreme Court, First Judicial Department, affirmed without opinion, 30 App. Div. 2d 781, 291 N. Y. S. 2d 1005 (1968).   The New York Court of Appeals then affirmed by a four-to-three vote, expressly sustaining the constitutionality of § 744 (b), 24 N. Y. 2d 196, 247 N. E. 2d 253 (1969).[3]

---

[2] The ruling appears in the following portion of the hearing transcript:

Counsel: "Your Honor is making a finding by the preponderance of the evidence."

Court: "Well, it convinces me."

Counsel: "It's not beyond a reasonable doubt, Your Honor."

Court: "That is true . . . . Our statute says a preponderance and a preponderance it is."

[3] Accord, e. g., In re Dennis M., 70 Cal. 2d 444, 450 P. 2d 296 (1969); In re Ellis, 253 A. 2d 789 (D. C. Ct. App. 1969); State v. Arenas, 253 Ore. 215, 453 P. 2d 915 (1969); State v. Santana, 444 S. W. 2d 614 (Texas 1969).   Contra, United States v. Costanzo, 395 F. 2d 441 (C. A. 4th Cir. 1968); In re Urbasek, 38 Ill. 2d 535, 232 N. E. 2d 716 (1967); Jones v. Commonwealth,

We noted probable jurisdiction, 396 U. S. 885 (1969). We reverse.

I

The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." C. McCormick, Evidence § 321, pp. 681–682 (1954); see also 9 J. Wigmore, Evidence § 2497 (3d ed. 1940). Although virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions may not conclusively establish it as a requirement of due process, such adherence does "reflect a profound judgment about the

185 Va. 335, 38 S. E. 2d 444 (1946); N. D. Cent. Code § 27–20–29 (2) (Supp. 1969); Colo. Rev. Stat. Ann. § 22–3–6 (1) (1967); Md. Ann. Code, Art. 26, § 70–18 (a) (Supp. 1969); N. J. Ct. Rule 6:9 (1)(f) (1967); Wash. Sup. Ct., Juv. Ct. Rule § 4.4 (b) (1969); cf. *In re Agler,* 19 Ohio St. 2d 70, 249 N. E. 2d 808 (1969).

Legislative adoption of the reasonable-doubt standard has been urged by the National Conference of Commissioners on Uniform State Laws and by the Children's Bureau of the Department of Health, Education, and Welfare's Social and Rehabilitation Service. See Uniform Juvenile Court Act § 29 (b) (1968); Children's Bureau, Social and Rehabilitation Service, U. S. Department of Health, Education, and Welfare, Legislative Guide for Drafting Family and Juvenile Court Acts § 32 (c) (1969). Cf. the proposal of the National Council on Crime and Delinquency that a "clear and convincing" standard be adopted. Model Rules for Juvenile Courts, Rule 26, p. 57 (1969). See generally Cohen, The Standard of Proof in Juvenile Proceedings: *Gault* Beyond a Reasonable Doubt, 68 Mich. L. Rev. 567 (1970).

way in which law should be enforced and justice administered." *Duncan* v. *Louisiana,* 391 U. S. 145, 155 (1968).

Expressions in many opinions of this Court indicate that it has long been assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required. See, for example, *Miles* v. *United States,* 103 U. S. 304, 312 (1881); *Davis* v. *United States,* 160 U. S. 469, 488 (1895); *Holt* v. *United States,* 218 U. S. 245, 253 (1910); *Wilson* v. *United States,* 232 U. S. 563, 569–570 (1914); *Brinegar* v. *United States,* 338 U. S. 160, 174 (1949); *Leland* v. *Oregon,* 343 U. S. 790, 795 (1952); *Holland* v. *United States,* 348 U. S. 121, 138 (1954); *Speiser* v. *Randall,* 357 U. S. 513, 525–526 (1958). Cf. *Coffin* v. *United States,* 156 U. S. 432 (1895). Mr. Justice Frankfurter stated that "[i]t is the duty of the Government to establish . . . guilt beyond a reasonable doubt. This notion—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.' " *Leland* v. *Oregon, supra,* at 802–803 (dissenting opinion). In a similar vein, the Court said in *Brinegar* v. *United States, supra,* at 174, that "[g]uilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty and property." *Davis* v. *United States, supra,* at 488, stated that the requirement is implicit in "constitutions . . . [which] recognize the fundamental principles that are deemed essential for the protection of life and liberty." In *Davis* a murder conviction was

reversed because the trial judge instructed the jury that it was their duty to convict when the evidence was equally balanced regarding the sanity of the accused. This Court said: "On the contrary, he is entitled to an acquittal of the specific crime charged if upon all the evidence there is reasonable doubt whether he was capable in law of committing crime. . . . No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them . . . is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." *Id.*, at 484, 493.

The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law." *Coffin* v. *United States, supra,* at 453. As the dissenters in the New York Court of Appeals observed, and we agree, "a person accused of a crime . . . would be at a severe disadvantage, a disadvantage amounting to a lack of fundamental fairness, if he could be adjudged guilty and imprisoned for years on the strength of the same evidence as would suffice in a civil case." 24 N. Y. 2d, at 205, 247 N. E. 2d, at 259.

The requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. Accordingly, a society

that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is reasonable doubt about his guilt. As we said in *Speiser* v. *Randall, supra,* at 525–526: "There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of . . . persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt." To this end, the reasonable-doubt standard is indispensable, for it "impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." Dorsen & Rezneck, In Re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, pp. 1, 26 (1967).

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

## II

We turn to the question whether juveniles, like adults, are constitutionally entitled to proof beyond a reasonable doubt when they are charged with violation of a criminal law. The same considerations that demand extreme caution in factfinding to protect the innocent adult apply as well to the innocent child. We do not find convincing the contrary arguments of the New York Court of Appeals. *Gault* rendered untenable much of the reasoning relied upon by that court to sustain the constitutionality of § 744 (b). The Court of Appeals indicated that a delinquency adjudication "is not a 'conviction' (§ 781); that it affects no right or privilege, including the right to hold public office or to obtain a license (§ 782); and a cloak of protective confidentiality is thrown around all the proceedings (§§ 783–784)." 24 N. Y. 2d, at 200, 247 N. E. 2d, at 255–256. The court said further: "The delinquency status is not made a crime; and the proceedings are not criminal. There is, hence, no deprivation of due process in the statutory provision [challenged by appellant] . . . ." 24 N. Y. 2d, at 203, 247 N. E. 2d, at 257. In effect the Court of Appeals distinguished the proceedings in question here from a criminal prosecution by use of what *Gault* called the " 'civil' label-of-convenience which has been attached to juvenile proceedings." 387 U. S., at 50. But *Gault* expressly rejected that distinction as a reason for holding the Due Process Clause inapplicable to a juvenile proceeding. 387 U. S., at 50–51. The Court of Appeals also attempted to justify the preponderance standard on the related ground that juvenile proceedings are designed "not to punish, but to save the child." 24 N. Y. 2d, at 197, 247 N. E. 2d, at 254. Again, however, *Gault* expressly rejected this justification. 387 U. S., at 27. We made clear in that decision that civil labels and good

intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for "[a] proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution." *Id.,* at 36.

Nor do we perceive any merit in the argument that to afford juveniles the protection of proof beyond a reasonable doubt would risk destruction of beneficial aspects of the juvenile process.[4] Use of the reasonable-doubt standard during the adjudicatory hearing will not disturb New York's policies that a finding that a child has violated a criminal law does not constitute a criminal conviction, that such a finding does not deprive the child of his civil rights, and that juvenile proceedings are confidential. Nor will there be any effect on the informality, flexibility, or speed of the hearing at which the factfinding takes place. And the opportunity during the post-adjudicatory or dispositional hearing for a wide-ranging review of the child's social history and for his individualized treatment will remain unimpaired. Similarly, there will be no effect on the pro-

---

[4] Appellee, New York City, apparently concedes as much in its Brief, page 8, where it states:

"A determination that the New York law unconstitutionally denies due process because it does not provide for use of the reasonable doubt standard probably would not have a serious impact if all that resulted would be a change in the quantum of proof."

And Dorsen & Rezneck, *supra,* at 27, have observed:

"[T]he reasonable doubt test is superior to all others in protecting against an unjust adjudication of guilt, and that is as much a concern of the juvenile court as of the criminal court. It is difficult to see how the distinctive objectives of the juvenile court give rise to a legitimate institutional interest in finding a juvenile to have committed a violation of the criminal law on less evidence than if he were an adult."

cedures distinctive to juvenile proceedings that are employed prior to the adjudicatory hearing.

The Court of Appeals observed that "a child's best interest is not necessarily, or even probably, promoted if he wins in the particular inquiry which may bring him to the juvenile court." 24 N. Y. 2d, at 199, 247 N. E. 2d, at 255. It is true, of course, that the juvenile may be engaging in a general course of conduct inimical to his welfare that calls for judicial intervention. But that intervention cannot take the form of subjecting the child to the stigma of a finding that he violated a criminal law [5] and to the possibility of institutional confinement on proof insufficient to convict him were he an adult.

We conclude, as we concluded regarding the essential due process safeguards applied in *Gault*, that the observance of the standard of proof beyond a reasonable doubt "will not compel the States to abandon or displace any of the substantive benefits of the juvenile process." *Gault, supra*, at 21.

Finally, we reject the Court of Appeals' suggestion that there is, in any event, only a "tenuous difference" between the reasonable-doubt and preponderance standards. The suggestion is singularly unpersuasive. In this very case, the trial judge's ability to distinguish between the two standards enabled him to make a finding of guilt that he conceded he might not have made under the standard of proof beyond a reasonable doubt. Indeed, the trial judge's action evidences the accuracy of the observation of commentators that "the preponderance test is susceptible to the misinter-

---

[5] The more comprehensive and effective the procedures used to prevent public disclosure of the finding, the less the danger of stigma. As we indicated in *Gault*, however, often the "claim of secrecy . . . is more rhetoric than reality." 387 U. S., at 24.

pretation that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted." Dorsen & Rezneck, *supra,* at 26–27.[6]

### III

In sum, the constitutional safeguard of proof beyond a reasonable doubt is as much required during the adjudicatory stage of a delinquency proceeding as are those constitutional safeguards applied in *Gault*—notice of charges, right to counsel, the rights of confrontation and examination, and the privilege against self-incrimination. We therefore hold, in agreement with Chief Judge Fuld in dissent in the Court of Appeals, "that, where a 12-year-old child is charged with an act of stealing which renders him liable to confinement for as long as six years, then, as a matter of due process . . . the case against him must be proved beyond a reasonable doubt." 24 N. Y. 2d, at 207, 247 N. E. 2d, at 260.

*Reversed.*

MR. JUSTICE HARLAN, concurring.

No one, I daresay, would contend that state juvenile court trials are subject to *no* federal constitutional limitations. Differences have existed, however, among the members of this Court as to *what* constitutional protections do apply. See *In re Gault,* 387 U. S. 1 (1967).

---

[6] Compare this Court's rejection of the preponderance standard in deportation proceedings, where we ruled that the Government must support its allegations with "clear, unequivocal, and convincing evidence." *Woodby* v. *Immigration and Naturalization Service,* 385 U. S. 276, 285 (1966). Although we ruled in *Woodby* that deportation is not tantamount to a criminal conviction, we found that since it could lead to "drastic deprivations," it is impermissible for a person to be "banished from this country upon no higher degree of proof than applies in a negligence case." *Ibid.*

The present case draws in question the validity of a New York statute that permits a determination of juvenile delinquency, founded on a charge of criminal conduct, to be made on a standard of proof that is less rigorous than that which would obtain had the accused been tried for the same conduct in an ordinary criminal case. While I am in full agreement that this statutory provision offends the requirement of fundamental fairness embodied in the Due Process Clause of the Fourteenth Amendment, I am constrained to add something to what my Brother BRENNAN has written for the Court, lest the true nature of the constitutional problem presented become obscured or the impact on state juvenile court systems of what the Court holds today be exaggerated.

I

Professor Wigmore, in discussing the various attempts by courts to define how convinced one must be to be convinced beyond a reasonable doubt, wryly observed: "The truth is that no one has yet invented or discovered a mode of measurement for the intensity of human belief. Hence there can be yet no successful method of communicating intelligibly . . . a sound method of self-analysis for one's belief," 9 J. Wigmore, Evidence 325 (3d ed. 1940).[1]

Notwithstanding Professor Wigmore's skepticism, we have before us a case where the choice of the standard of proof has made a difference: the juvenile court judge below forthrightly acknowledged that he believed by a preponderance of the evidence, but was not convinced beyond a reasonable doubt, that appellant stole $112 from the complainant's pocketbook. Moreover, even though the labels used for alternative standards of proof are

---

[1] See also Paulsen, Juvenile Courts and the Legacy of '67, 43 Ind. L. J. 527, 551–552 (1968).

vague and not a very sure guide to decisionmaking, the choice of the standard for a particular variety of adjudication does, I think, reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations.[2]

To explain why I think this so, I begin by stating two propositions, neither of which I believe can be fairly disputed. First, in a judicial proceeding in which there is a dispute about the facts of some earlier event, the factfinder cannot acquire unassailably accurate knowledge of what happened. Instead, all the factfinder can acquire is a belief of what *probably* happened. The intensity of this belief—the degree to which a factfinder is convinced that a given act actually occurred—can, of course, vary. In this regard, a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. Although the phrases "preponderance of the evidence" and "proof beyond a reasonable doubt" are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions.

A second proposition, which is really nothing more than a corollary of the first, is that the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions. In a lawsuit between two parties, a factual error can make a difference in one of two ways. First, it can result in a judgment in favor of the plaintiff when the true facts warrant a judgment for the defendant. The analogue in a criminal case would be the conviction

---

[2] For an interesting analysis of standards of proof see Kaplan, Decision Theory and the Factfinding Process, 20 Stan. L. Rev. 1065, 1071–1077 (1968).

of an innocent man. On the other hand, an erroneous factual determination can result in a judgment for the defendant when the true facts justify a judgment in plaintiff's favor. The criminal analogue would be the acquittal of a guilty man.

The standard of proof influences the relative frequency of these two types of erroneous outcomes. If, for example, the standard of proof for a criminal trial were a preponderance of the evidence rather than proof beyond a reasonable doubt, there would be a smaller risk of factual errors that result in freeing guilty persons, but a far greater risk of factual errors that result in convicting the innocent. Because the standard of proof affects the comparative frequency of these two types of erroneous outcomes, the choice of the standard to be applied in a particular kind of litigation should, in a rational world, reflect an assessment of the comparative social disutility of each.

When one makes such an assessment, the reason for different standards of proof in civil as opposed to criminal litigation becomes apparent. In a civil suit between two private parties for money damages, for example, we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor. A preponderance of the evidence standard therefore seems peculiarly appropriate for, as explained most sensibly,[3] it simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party

---

[3] The preponderance test has been criticized, justifiably in my view, when it is read as asking the trier of fact to weigh in some objective sense the quantity of evidence submitted by each side rather than asking him to decide what he believes most probably happened. See J. Maguire, Evidence, Common Sense and Common Law 180 (1947).

who has the burden to persuade the [judge] of the fact's existence." [4]

In a criminal case, on the other hand, we do not view the social disutility of convicting an innocent man as equivalent to the disutility of acquitting someone who is guilty. As MR. JUSTICE BRENNAN wrote for the Court in *Speiser v. Randall*, 357 U. S. 513, 525–526 (1958):

> "There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden . . . of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt."

In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free. It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, [5] requires a more stringent standard for criminal trials than for ordinary civil litigation.

---

[4] F. James, Civil Procedure 250–251 (1965); see E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 84–85 (1956).

[5] In dissent my Brother BLACK again argues that, apart from the specific prohibitions of the first eight amendments, any procedure spelled out by a legislature—no matter how unfair—passes constitutional muster under the Due Process Clause. He bottoms his conclusion on history that he claims demonstrates (1) that due process means "law of the land"; (2) that any legislative enactment, *ipso facto,* is part of the law of the land; and (3) that the Fourteenth

## II

When one assesses the consequences of an erroneous factual determination in a juvenile delinquency proceeding in which a youth is accused of a crime, I think it must be concluded that, while the consequences are

Amendment incorporates the prohibitions of the Bill of Rights and applies them to the States. I cannot refrain from expressing my continued bafflement at my Brother BLACK's insistence that due process, whether under the Fourteenth Amendment or the Fifth Amendment, does not embody a concept of fundamental fairness as part of our scheme of ' constitutionally ordered liberty. His thesis flies in the face of a course of judicial history reflected in an unbroken line of opinions that have interpreted due process to impose restraints on the procedures government may adopt in its dealing with its citizens, see, *e. g.*, the cases cited in my dissenting opinions in *Poe* v. *Ullman,* 367 U. S. 497, 522, 539–545 (1961); *Duncan* v. *Louisiana,* 391 U. S. 145, 171 (1968); as well as the uncontroverted scholarly research (notwithstanding H. Flack, The Adoption of the Fourteenth Amendment (1908)), respecting the intendment of the Due Process Clause of the Fourteenth Amendment, see Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5 (1949). Indeed, with all respect, the very case cited in Brother BLACK's dissent as establishing that "due process of law" means "law of the land" rejected the argument that any statute, by the mere process of enactment, met the requirements of the Due Process Clause. In *Murray's Lessee* v. *Hoboken Land & Improv. Co.,* 18 How. 272 (1856), an issue was whether a "distress warrant" issued by the Solicitor of the Treasury under an Act of Congress to collect money due for taxes offended the Due Process Clause. Justice Curtis wrote: "That the warrant now in question is legal process, is not denied. It was issued in conformity with an act of Congress. But is it 'due process of law?' The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. *It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will."* *Id.,* at 276. (Emphasis supplied.)

not identical to those in a criminal case, the differences will not support a distinction in the standard of proof. First, and of paramount importance, a factual error here, as in a criminal case, exposes the accused to a complete loss of his personal liberty through a state-imposed confinement away from his home, family, and friends. And, second, a delinquency determination, to some extent at least, stigmatizes a youth in that it is by definition bottomed on a finding that the accused committed a crime.[6] Although there are no doubt costs to society (and possibly even to the youth himself) in letting a guilty youth go free, I think here, as in a criminal case, it is far worse to declare an innocent youth a delinquent. I therefore agree that a juvenile court judge should be no less convinced of the factual conclusion that the accused committed the criminal act with which he is charged than would be required in a criminal trial.

## III

I wish to emphasize, as I did in my separate opinion in *Gault*, 387 U. S. 1, 65, that there is no automatic con-

[6] The New York statute was amended to distinguish between a "juvenile delinquent," *i. e.*, a youth "who does any act which, if done by an adult, would constitute a crime," N. Y. Family Court Act § 712 (1963), and a "[p]erson in need of supervision" [PINS] who is a person "who is an habitual truant or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent or other lawful authority." The PINS category was established in order to avoid the stigma of finding someone to be a "juvenile delinquent" unless he committed a criminal act. The Legislative Committee report stated: " 'Juvenile delinquent' is now a term of disapproval. The judges of the Children's Court and the Domestic Relations Court of course are aware of this and also aware that government officials and private employers often learn of an adjudication of delinquency." N. Y. Jt. Legislative Committee on Court Reorganization, The Family Court Act, pt. 2, p. 7 (1962). Moreover, the powers of the police and courts differ in these two categories of cases. See *id.*, at 7–9. Thus, in a PINS type case, the consequences of an erroneous factual determination are by no means identical to those involved here.

gruence between the procedural requirements imposed by due process in a criminal case, and those imposed by due process in juvenile cases.[7]   It is of great importance, in my view, that procedural strictures not be constitutionally imposed that jeopardize "the essential elements of the State's purpose" in creating juvenile courts, *id.,* at 72.   In this regard, I think it worth emphasizing that the requirement of proof beyond a reasonable doubt that a juvenile committed a criminal act before he is found to be a delinquent does not (1) interfere with the worthy goal of rehabilitating the juvenile, (2) make any significant difference in the extent to which a youth is stigmatized as a "criminal" because he has been found to be a delinquent, or (3) burden the juvenile courts with a procedural requirement that will make juvenile adjudications significantly more time consuming, or rigid.   Today's decision simply requires a juvenile court judge to be more confident in his belief that the youth did the act with which he has been charged.

With these observations, I join the Court's opinion, subject only to the constitutional reservations expressed in my opinion in *Gault.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE STEWART joins, dissenting.

The Court's opinion today rests entirely on the assumption that all juvenile proceedings are "criminal prosecutions," hence subject to constitutional limitations. This derives from earlier holdings, which, like today's

---

[7] In *Gault,* for example, I agreed with the majority that due process required (1) adequate notice of the "nature and terms" of the proceedings; (2) notice of the right to retain counsel, and an obligation on the State to provide counsel for indigents "in cases in which the child may be confined"; and (3) a written record "adequate to permit effective review." 387 U. S., at 72. Unlike the majority, however, I thought it unnecessary at the time of *Gault* to impose the additional requirements of the privilege against self-incrimination, confrontation, and cross-examination.

holding, were steps eroding the differences between juvenile courts and traditional criminal courts. The original concept of the juvenile court system was to provide a benevolent and less formal means than criminal courts could provide for dealing with the special and often sensitive problems of youthful offenders. Since I see no constitutional requirement of due process sufficient to overcome the legislative judgment of the States in this area, I dissent from further strait-jacketing of an already overly restricted system. What the juvenile court system needs is not more but less of the trappings of legal procedure and judicial formalism; the juvenile court system requires breathing room and flexibility in order to survive, if it can survive the repeated assaults from this Court.

Much of the judicial attitude manifested by the Court's opinion today and earlier holdings in this field is really a protest against inadequate juvenile court staffs and facilities; we "burn down the stable to get rid of the mice." The lack of support and the distressing growth of juvenile crime have combined to make for a literal breakdown in many if not most juvenile courts. Constitutional problems were not seen while those courts functioned in an atmosphere where juvenile judges were not crushed with an avalanche of cases.

My hope is that today's decision will not spell the end of a generously conceived program of compassionate treatment intended to mitigate the rigors and trauma of exposing youthful offenders to a traditional criminal court; each step we take turns the clock back to the pre-juvenile-court era. I cannot regard it as a manifestation of progress to transform juvenile courts into criminal courts, which is what we are well on the way to accomplishing. We can only hope the legislative response will not reflect our own by having these courts abolished.

Mr. Justice Black, dissenting.

The majority states that "many opinions of this Court indicate that it has long been assumed that proof of. a criminal charge beyond a reasonable doubt is constitutionally required." *Ante,* at 362. I have joined in some of those opinions, as well as the dissenting opinion of Mr. Justice Frankfurter in *Leland* v. *Oregon,* 343 U. S. 790, 802 (1952). The Court has never clearly held, however, that proof beyond a reasonable doubt is either expressly or impliedly commanded by any provision of the Constitution. The Bill of Rights, which in my view is made fully applicable to the States by the Fourteenth Amendment, see *Adamson* v. *California,* 332 U. S. 46, 71–75 (1947) (dissenting opinion), does by express language provide for, among other things, a right to counsel in criminal trials, a right to indictment, and the right of a defendant to be informed of the nature of the charges against him.[1] And in two places the Constitution provides for trial by jury,[2] but nowhere in that document is there any statement that conviction of crime requires proof of guilt beyond a reasonable doubt. The Constitution thus goes into some detail to spell out what kind of trial a defendant charged with crime should have, and I believe the Court has no power to add to or subtract from the procedures set forth by the Founders. I realize that it is far easier to substitute individual judges' ideas of "fairness" for the fairness prescribed by the Constitution, but I shall not at any time surrender my belief that that document itself should be our guide, not our own concept of what is fair, decent, and right. That this old "shock-the-conscience" test is what the Court is relying on, rather than the words of the Constitution,

---

[1] Amdts. V, VI, U. S. Constitution.

[2] Art. III, § 2, cl. 3; Amdt. VI, U. S. Constitution.

is clearly enough revealed by the reference of the majority to "fair treatment" and to the statement by the dissenting judges in the New York Court of Appeals that failure to require proof beyond a reasonable doubt amounts to a "lack of fundamental fairness." *Ante,* at 359, 363. As I have said time and time again, I prefer to put my faith in the words of the written Constitution itself rather than to rely on the shifting, day-to-day standards of fairness of individual judges.

I

Our Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." [3] The four words—due process of law—have been the center of substantial legal debate over the years. See *Chambers* v. *Florida,* 309 U. S. 227, 235–236, and n. 8 (1940). Some might think that the words themselves are vague. But any possible ambiguity disappears when the phrase is viewed in the light of history and the accepted meaning of those words prior to and at the time our Constitution was written.

"Due process of law" was originally used as a shorthand expression for governmental proceedings according to the "law of the land" as it existed at the time of those proceedings. Both phrases are derived from the laws of England and have traditionally been regarded as meaning the same thing. The Magna Carta provided that:

> "No Freeman shall be taken, or imprisoned, or be disseised of his Freehold, or Liberties, or free Customs, or be outlawed, or exiled, or any otherwise

---

[3] The Fifth Amendment applies this limitation to the Federal Government and the Fourteenth Amendment imposes the same restriction on the States.

> destroyed; nor will we not pass upon him, nor condemn him, but by lawful Judgment of his Peers, or by the Law of the Land." [4]

Later English statutes reinforced and confirmed these basic freedoms. In 1350 a statute declared that "it is contained in the Great Charter of the Franchises of England, that none shall be imprisoned nor put out of his Freehold, nor of his Franchises nor free Custom, unless it be by the Law of the Land . . . ." [5] Four years later another statute provided "[t]hat no Man of what Estate or Condition that he be, shall be put out of Land or Tenement, nor taken nor imprisoned, nor disinherited, nor put to Death, without being brought in Answer by due Process of the Law." [6] And in 1363 it was provided "that no man be taken or imprisoned, nor put out of his freehold, without process of law." [7]

Drawing on these and other sources, Lord Coke, in 1642, concluded that "due process of law" was synonymous with the phrase "by law of the land." [8] One of the earliest cases in this Court to involve the interpretation of the Due Process Clause of the Fifth Amendment declared that "[t]he words, 'due process of law,' were undoubtedly intended to convey the same meaning as the words 'by the law of the land' in *Magna Charta*." *Murray's Lessee* v. *Hoboken Land & Improv. Co.*, 18 How. 272, 276 (1856).

While it is thus unmistakably clear that "due process of law" means according to "the law of the land," this Court has not consistently defined what "the law of the

---

[4] 9 Hen. 3, c. 29 (1225). A similar provision appeared in c. 39 of the original issue signed by King John in 1215.

[5] 25 Edw. 3, Stat. 5, c. IV.

[6] 28 Edw. 3, c. III.

[7] 37 Edw. 3, c. XVIII.

[8] Coke's Institutes, Second Part, 50 (1st ed. 1642).

**380**

land" means and in my view members of this Court frequently continue to misconceive the correct interpretation of that phrase. In *Murray's Lessee, supra,* Mr. Justice Curtis, speaking for the Court, stated:

> "The constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due process of law,' by its mere will. To what principles, then, are we to resort to ascertain whether this process, enacted by congress, is due process? To this the answer must be twofold. We must examine the constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country." *Id.,* at 276–277.[9]

Later in *Twining* v. *New Jersey,* 211 U. S. 78 (1908), Mr. Justice Moody, again speaking for the Court, reaffirmed that "due process of law" meant "by law of the

---

[9] Cf. *United States* v. *Hudson,* 7 Cranch 32 (1812), in which the Court held that there was no jurisdiction in federal courts to try criminal charges based on the common law and that all federal crimes must be based on a statute of Congress.

land," but he went on to modify Mr. Justice Curtis' definition of the phrase. He stated:

> "First. What is due process of law may be ascertained by an examination of those settled usages and modes of proceedings existing in the common and statute law of England before the emigration of our ancestors, and shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country. . . .
>
> "Second. It does not follow, however, that a procedure settled in English law at the time of the emigration, and brought to this country and practiced by our ancestors, is an essential element of due process of law. If that were so the procedure of the first half of the seventeenth century would be fastened upon the American jurisprudence like a straight-jacket, only to be unloosed by constitutional amendment. . . .
>
> "Third. But, consistently with the requirements of due process, no change in ancient procedure can be made which disregards those fundamental principles, to be ascertained from time to time by judicial action, which have relation to process of law and protect the citizen in his private right, and guard him against the arbitrary action of government." *Id.*, at 100–101.[10]

In those words is found the kernel of the "natural law due process" notion by which this Court frees itself from the limits of a written Constitution and sets itself loose to declare any law unconstitutional that "shocks its conscience," deprives a person of "fundamental fairness," or violates the principles "implicit in the concept of

---

[10] Cf. the views of Mr. Justice Iredell in *Calder* v. *Bull*, 3 Dall. 386, 398 (1798).

ordered liberty." See *Rochin* v. *California,* 342 U. S. 165, 172 (1952); *Palko* v. *Connecticut,* 302 U. S. 319, 325 (1937). While this approach has been frequently used in deciding so-called "procedural" questions, it has evolved into a device as easily invoked to declare invalid "substantive" laws that sufficiently shock the consciences of at least five members of this Court. See, *e. g., Lochner* v. *New York,* 198 U. S. 45 (1905); *Coppage* v. *Kansas,* 236 U. S. 1 (1915); *Burns Baking Co.* v. *Bryan,* 264 U. S. 504 (1924); *Griswold* v. *Connecticut,* 381 U. S. 479 (1965). I have set forth at length in prior opinions my own views that this concept is completely at odds with the basic principle that our Government is one of limited powers and that such an arrogation of unlimited authority by the judiciary cannot be supported by the language or the history of any provision of the Constitution. See, *e. g., Adamson* v. *California,* 332 U. S. 46, 68 (1947) (dissenting opinion); *Griswold* v. *Connecticut, supra,* at 507 (1965) (dissenting opinion).

In my view both Mr. Justice Curtis and Mr. Justice Moody gave "due process of law" an unjustifiably broad interpretation. For me the only correct meaning of that phrase is that our Government must proceed according to the "law of the land"—that is, according to written constitutional and statutory provisions as interpreted by court decisions. The Due Process Clause, in both the Fifth and Fourteenth Amendments, in and of itself does not add to those provisions, but in effect states that our governments are governments of law and constitutionally bound to act only according to law.[11] To some that view may seem a degrading and niggardly view of what is undoubtedly a fundamental part of our basic freedoms.

---

[11] It is not the Due Process Clause of the Fourteenth Amendment, standing alone, that requires my conclusion that that Amendment was intended to apply fully the protection of the Bill of Rights to actions by the States. That conclusion follows from the language

But that criticism fails to note the historical importance of our Constitution and the virtual revolution in the history of the government of nations that was achieved by forming a government that from the beginning had its limits of power set forth in one written document that

of the entire first section of the Fourteenth Amendment, as illuminated by the legislative history surrounding its adoption. See *Adamson* v. *California, supra,* at 71–75, 92–123.

MR. JUSTICE HARLAN continues to insist that uncontroverted scholarly research shows that the Fourteenth Amendment did *not* incorporate the Bill of Rights as limitations on the States. See *Poe* v. *Ullman,* 367 U. S. 497, 540 (1961) (dissenting opinion); *Griswold* v. *Connecticut, supra,* at 500 (concurring in judgment); *ante,* at 372–373, n. 5. I cannot understand that conclusion. Mr. Fairman, in the article repeatedly cited by MR. JUSTICE HARLAN, surveys the legislative history and concludes that it is his opinion that the amendment did not incorporate the Bill of Rights. Mr. Flack, in at least an equally "scholarly" writing, surveys substantially the same documents relied upon by Mr. Fairman and concludes that a prime objective of Congress in proposing the adoption of the Fourteenth Amendment was "[t]o make the Bill of Rights (the first eight Amendments) binding upon, or applicable to, the States." Compare H. Flack, The Adoption of the Fourteenth Amendment 94 (1908), with Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan. L. Rev. 5 (1949). It is, of course, significant that since the adoption of the Fourteenth Amendment this Court has held almost all the provisions of the Bill of Rights applicable to the States: the First Amendment, *e. g., Gitlow* v. *New York,* 268 U. S. 652 (1925), *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940), *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); the Fourth Amendment, *Mapp* v. *Ohio,* 367 U. S. 643 (1961); the Fifth Amendment, *Chicago B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226 (1897), *Malloy* v. *Hogan,* 378 U. S. 1 (1964), *Benton* v. *Maryland,* 395 U. S. 784 (1969); the Sixth Amendment, *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), *Pointer* v. *Texas,* 380 U. S. 400 (1965), *Klopfer* v. *North Carolina,* 386 U. S. 213 (1967), *Duncan* v. *Louisiana,* 391 U. S. 145 (1968); and the Eighth Amendment, *Robinson* v. *California,* 370 U. S. 660 (1962). To me this history indicates that in the end Mr. Flack's thesis has fared much better than Mr. Fairman's "uncontroverted" scholarship.

also made it abundantly clear that all governmental actions affecting life, liberty, and property were to be according to law.

For years our ancestors had struggled in an attempt to bring England under one written constitution, consolidating in one place all the threads of the fundamental law of that nation. They almost succeeded in that attempt,[12] but it was not until after the American Revolution that men were able to achieve that long-sought goal. But the struggle had not been simply to put all the constitutional law in one document, it was also to make certain that men would be governed by *law*, not the arbitrary fiat of the man or men in power. Our ancestors' ancestors had known the tyranny of the kings and the rule of man and it was, in my view, in order to insure against such actions that the Founders wrote into our own Magna Carta the fundamental principle of the rule of law, as expressed in the historically meaningful phrase "due process of law." The many decisions of this Court that have found in that phrase a blanket authority to govern the country according to the views of at least five members of this institution have ignored the essential meaning of the very words they invoke. When this Court assumes for itself the power to declare any law—state or federal—unconstitutional because it offends the majority's own views of what is fundamental and decent in our society, our Nation ceases to be governed according to the "law of the land" and instead becomes one governed ultimately by the "law of the judges."

It can be, and has been, argued that when this Court strikes down a legislative act because it offends the idea of "fundamental fairness," it furthers the basic thrust of our Bill of Rights by protecting individual freedom.

---

[12] See J. Frank, The Levellers (1955).

But that argument ignores the effect of such decisions on perhaps the most fundamental individual liberty of our people—the right of each man to participate in the self-government of his society. Our Federal Government was set up as one of limited powers, but it was also given broad power to do all that was "necessary and proper" to carry out its basic purpose of governing the Nation, so long as those powers were not exercised contrary to the limitations set forth in the Constitution. And the States, to the extent they are not restrained by the provisions in that document, were to be left free to govern themselves in accordance with their own views of fairness and decency. Any legislature presumably passes a law because it thinks the end result will help more than hinder and will thus further the liberty of the society as a whole. The people, through their elected representatives, may of course be wrong in making those determinations, but the right of self-government that our Constitution preserves is just as important as any of the specific individual freedoms preserved in the Bill of Rights. The liberty of government by the people, in my opinion, should never be denied by this Court except when the decision of the people as stated in laws passed by their chosen representatives, conflicts with the express or necessarily implied commands of our Constitution.

## II

I admit a strong, persuasive argument can be made for a standard of proof beyond a reasonable doubt in criminal cases—and the majority has made that argument well—but it is not for me as a judge to say for that reason that Congress or the States are without constitutional power to establish another standard that the Constitution does not otherwise forbid. It is quite true that proof beyond a reasonable doubt has long been required in federal criminal trials. It is also true that

this requirement is almost universally found in the governing laws of the States. And as long as a particular jurisdiction requires proof beyond a reasonable doubt, then the Due Process Clause commands that every trial in that jurisdiction must adhere to that standard. See *Turner* v. *United States,* 396 U. S. 398, 430 (1970) (BLACK, J., dissenting). But when, as here, a State through its duly constituted legislative branch decides to apply a different standard, then that standard, unless it is otherwise unconstitutional, must be applied to insure that persons are treated according to the "law of the land." The State of New York has made such a decision, and in my view nothing in the Due Process Clause invalidates it.