**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael E. GAUDIN, Defendant–**
**Appellant.**

No. 90–30334.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1991.

Submission Withdrawn Oct. 25, 1991.

Resubmitted June 19, 1992.

Opinion Filed Feb. 18, 1993.

Opinion Withdrawn June 22, 1993.

Decided June 22, 1993.

Richard Hansen, Allen & Hansen, Seattle, WA, for defendant-appellant.

Kris A. McLean, Asst. U.S. Atty., Helena, MT, for plaintiff-appellee.

Before: WALLACE, Chief Judge, HUG, and RYMER, Circuit Judges.

### ORDER

The opinion filed February 18, 1993, 986 F.2d 1267, is withdrawn.

HUG, Circuit Judge:

This case involves an alleged scheme in which Gaudin purchased houses, then entered into sham sales transactions at inflated appraised prices, obtained loans on the basis of the inflated prices, reacquired the property, rented it, failed to make the mortgage payments, and applied the rents to his own use. He was convicted of equity skimming, a violation of 12 U.S.C. § 1709–2, for his failure to pay the HUD/FHA insured mortgages while retaining the rents on the secured

properties and applying them to his own use. He was also convicted of 43 counts of violations of 18 U.S.C. § 1001 for false statements made on the loan documents submitted.

The issue on the equity skimming charge is whether sufficient evidence was adduced to sustain the conviction. The principal issue on the false statement counts is whether the district court erred in instructing the jury that one of the elements of the crime, the materiality of the statements, was established as a matter of law. Because we reverse these 43 counts on this issue, we need not address the other claimed evidentiary and instructional errors involving those counts. We find sufficient evidence to sustain the equity skimming charge and affirm the conviction on that count.

### I. *Facts*

Michael Gaudin, a real estate broker and developer, and two real estate appraisers were charged in a multi-count indictment on October 19, 1989, based on a series of real estate transactions involving loans insured by the United States Department of Housing and Urban Development ("HUD") through the Federal Housing Administration ("FHA"). Count 1 charged Gaudin with equity skimming in violation of 12 U.S.C. § 1709-2. Counts 2–42 charged him with making or causing to be made false entries on HUD settlement statements in violation of 18 U.S.C. § 1001. Counts 43–46 charged Gaudin and the appraisers with making false statements on HUD appraisal forms. The appraisers were tried separately. Count 18 was dismissed, and Gaudin was convicted by a jury on all remaining counts. Count 43 was dismissed at sentencing for insufficient evidence. Gaudin's motion for a new trial was denied; he was sentenced to 36 months in prison on Court 1, and 10 months in prison on each of the other counts, all sentences to run concurrently.

The charges arose from a series of transactions from December 31, 1985 through December 1, 1988. Gaudin purchased 29 single family homes with loans secured by deeds of trust and mortgages insured through FHA. Within one year of the dates of purchase, the loans went into default.

Gaudin did business as Hallmark Properties, Montana Regency, Inc., and North West Housing, Inc. He renovated and resold rental housing. He presented borrowers with complete loan packages to United Western Mortgage Company, which participated in FHA's direct endorsement program. The loan packages contained purchase and sale agreements, appraisal reports, promissory notes, trust indentures, settlement statements, and letters from each borrower certifying that no portion of any equity payment would be refunded. Sixty-two such transactions occurred.

Gaudin, or one of his companies, was the original owner of the real estate involved in each transaction. The Government's case was based on evidence that Gaudin was in effect selling property to himself at an artificially inflated price based on inflated appraisals. These sales and appraisals were then used to obtain loans that exceeded the real value of the property. Gaudin solicited friends and relatives to act as buyers, to whom he paid $1,000 each to buy a house from him or from one of his companies. In most of the transactions, the buyers made the necessary down payments by making an equity transfer of a fractional interest in the buyer's own home, by deeding the interest to Gaudin, who promptly deeded it back to the buyer. Several buyers made cash down payments but were assured that the cash would be returned immediately. Gaudin paid all costs of loan origination and closing. The mortgage company funded the loans based upon the representations made on the settlement sheets, which were forwarded to FHA/HUD, who insured the loans.

No loan payments were made by the buyers. The equity payments were refunded, and Gaudin assumed the loans, took title in a name other than the name under which he originally owned the property, rented the houses, collected rent, and subsequently defaulted on 29 loans insured by HUD/FHA. The total gross sale price of the properties sold by Gaudin and then assumed back was $2,003,700. Gaudin netted $982,003, according to the Government, and retained title to the properties.

At trial, Gaudin claimed that the $1,000 payments were for the right to repurchase the properties and to assume the FHA loans. Not all of the loans made were assumed by Gaudin. When the mortgage company discovered in April 1987, that Gaudin had assumed many of the loans, it terminated all of Gaudin's financing. Gaudin then defaulted on the loans. Although he continued to collect between $6000 and $8000 per month in rent from 29 of the properties until December 31, 1988, he made no payments on the loans.

The false statements charges in Counts 2–42 were based upon the representations made on line 303 of the HUD-1 settlement statements prepared in each transaction. Line 303 shows the amount of cash paid "to" or "from" the borrower to close the loan. The Government contended that the amount represented as being paid "from" the borrower affected the mortgage company's determination of the amount of the loan, and the decision of HUD/FHA to insure the loan. It concealed the true nature of the transaction and Gaudin's part in it.

Counts 44–46 were based upon evidence that Gaudin and an appraiser made false statements on HUD Forms 92800, Appraisal Report Forms, by overstating the fair market value of properties, in violation of 18 U.S.C. § 1001.

## II. *Equity Skimming*

■■■ The only error alleged in connection with the equity skimming count was that there was insufficient evidence to support the verdict of the jury.[1] The crime charged is a violation of 12 U.S.C. § 1709–2 (1988). That statute provides in pertinent part as follows:

> Whoever, with intent to defraud, willfully engages in a pattern or practice of—
>
> (1) purchasing one- to four-family dwellings ... which are subject to a loan in default at time of purchase or in default

within one year subsequent to the purchase and the loan is secured by a mortgage or deed of trust insured or held by the Secretary of Housing and Urban Development or guaranteed by the Department of Veterans' Affairs, or the loan is made by the Department of Veterans' Affairs,

> (2) failing to make payments under the mortgage or deed of trust as the payments become due, regardless of whether the purchaser is obligated on the loan, and
>
> (3) applying or authorizing the application of rents from such dwellings for his own use,

shall be fined not more than $250,000 or imprisoned not more than 5 years, or both.

There is evidence that shows that Gaudin collected between $6,000 and $8,000 per month in rent from April 1987 until December 1988. Although there is evidence he continued to make payments on some of his mortgages, it is undisputed he made no payments after April 1987 on the 29 mortgages here in issue. The Government presented evidence that the rent proceeds from those 29 properties were used to pay for repairs and improvements, taxes, and mortgage payments on other loans. Some "surplus funds" were also identified.

Gaudin claims that the Government failed to prove that he applied the rent receipts to his own use. He asserts that his financial records show that none of the money was spent on anything other than expenses directly related to the mortgage property. He argues that because his records show that he used all the rents for upkeep and to make mortgage payments until his financing was terminated in April 1987, he is not guilty of equity skimming. Applying the rent proceeds to payments on other mortgages, to taxes, and to capital improvements on these

---

1. The appellant also raised two issues on appeal that he contends relate to all charges: (1) the failure to give a requested instruction that good faith reliance on Government regulations constituted a defense, and (2) that the admission of some expert testimony and the reference to appellant's activities as "straw buyer" transactions was error. These issues actually pertain only to

the false statement charges discussed in part III. There is no evidence that Gaudin relied on Government regulations in violating the equity skimming statute. The expert opinion testimony and the "straw buyer" reference only concerned the false statement charges. We do not reach these issues because we reverse the false statement charges on other grounds.

and other houses, while making no mortgage payments from April 1987 to December 1988, is strong evidence of equity skimming. This evidence, viewed in the light most favorable to the Government, is sufficient to uphold the conviction.

### III. *False Statements*

We next turn to the charges involving the false statements, in violation of 18 U.S.C. § 1001 (1988). 18 U.S.C. § 1001 provides:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

An element of the false statements statute, 18 U.S.C. § 1001, is materiality. *United States v. Oren*, 893 F.2d 1057, 1063 (9th Cir.1990); *United States v. Facchini*, 874 F.2d 638, 641 (9th Cir.1989) (*en banc*). Materiality is defined as the "propensity to influence agency action." *United States v. Vaughn*, 797 F.2d 1485, 1490 (9th Cir.1986) (citation omitted). The false statement must have "the intrinsic capability of *influencing or affecting* the agency's or department's decision." *Facchini*, 874 F.2d at 643 (citation omitted). The materiality of a section 1001 false statement must be determined by the jury. *United States v. Valdez*, 594 F.2d 725, 729 (9th Cir.1979).

The district court instructed the jury that the statements charged in the indictments were material as a matter of law. This was error.[2] The defendant, however, did not object to the instruction at the time of trial. When a defendant has failed to object to an instruction, we review for plain error. *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir.1989). "Plain error is highly

prejudicial error affecting substantial rights, and is found only in exceptional circumstances. It must be highly probable that the error materially affected the verdict." *Id.* at 1102–03 (citations omitted).

Although the plain error requirement has been characterized in some cases as a procedural threshold to determine reviewability, in actuality it is a substantive standard to determine the significance of the error. It is an error that is so significant to the fairness of the trial that we will reverse, despite the fact that no adequate objection was made at trial. In *United States of America v. Hoac and Chan*, 990 F.2d 1099 (1993), we discussed the relationship of plain error to harmless error and noted that if an error is plain error it cannot be harmless. 990 F.2d at 1109. The plain error rule is the more restrictive standard. This logically follows from the requirements of orderly trial procedure. If an error occurs and it is properly objected to, the trial court has an opportunity to correct it. A failure to do so is then reviewed on appeal under the harmless error standard. If no objection is made, and the trial court has no opportunity to correct the error, more is required before the error will justify reversal.

The Government argues that even if the failure to submit the materiality question to the jury was error it was harmless error, as we held in *Valdez*, 594 F.2d at 729. With this prior precedent it is logical to discuss the harmfulness of the error first. The plain error determination overlaps the harmless error determination. The harmfulness of an error must necessarily be considered in order to determine if the error is plain error justifying reversal, because if an error is harmless, it cannot be plain error. *Hoac and Chan*, 990 F.2d at 1109.

In *Valdez*, in determining harmless error, we viewed the overwhelming nature of the evidence of whether the materiality of the statements was so clearly established that the failure to submit the issue to the jury was harmless beyond a reasonable doubt. 594 F.2d at 729. Recent Supreme

---

2. The Government contends that we should depart from our holding in *Valdez* that materiality is a question of fact. This panel, of course, is bound by the holding of *Valdez*.

Court opinions have caused us to reexamine the basis for this harmless error analysis. In *Martinez v. Borg,* 937 F.2d 422, 424–25 (9th Cir.1991), we adopted the analysis set forth by Justice Scalia in his concurring opinion in *Carella v. California,* 491 U.S. 263, 271, 109 S.Ct. 2419, 2423, 105 L.Ed.2d 218 (1989). As we noted in *Martinez,* this analysis was later refined in *Yates v. Evatt,* —— U.S. ——, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991). The *Yates* case is, of course, somewhat different from the case at hand, in that it dealt with the application of a mandatory rebuttable presumption. However, it is apparent from that decision that the reviewing court must identify which facts the jury considered under the instructions of the court on the pertinent issue in reaching its verdict. The opinion holds that the reviewing court must look to the evidence available to the jury "and presumably considered by the jury in accordance with the instructions" on that issue to determine if it is so overwhelming as to leave no reasonable doubt. *Id.,* —— U.S. at ——, 111 S.Ct. at 1893.[3] Under *Yates,* in determining harmless error, we may not consider all of the record evidence; we are confined to the evidence that a reasonable juror would have considered under the instructions that were given in arriving at a determination that an essential element of the crime had been proved beyond a reasonable doubt. —— U.S. at ——, 111 S.Ct. at 1894. Under the guidance of *Yates,* we may no longer consider the strength of the evidence and determine whether it is so clear that the jury *would have* found the element to exist had it been properly instructed, but we must determine

whether the jury was actually able to consider that evidence under the instructions of the court.

Therefore, it is apparent that when an element of the crime has been completely removed from the jury's determination, there can be no inquiry into what evidence the jury considered to establish that element, because the jury was precluded from considering the element at all. The fact that evidence existed, which the jury *could have considered* on the issue of materiality, had the issue been submitted to the jury under an appropriate instruction, is of no moment, because the jury was instructed not to consider the evidence as to materiality. Thus, simply stated under *Yates,* when an element of the crime that must be found by the jury is removed from jury consideration, that error cannot be harmless.[4]

Since the error is not harmless, we must then determine if it rises to the level of plain error. The Supreme Court has stated that in order to constitute plain error, the error must not only affect substantial rights, but also must have had "an unfair prejudicial impact on the jury's deliberations." *United States v. Young,* 470 U.S. 1, 16–17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985). In this case an essential element of the crime was completely removed from the consideration of the jury and thus the jury had no opportunity to deliberate on that issue.

 The state has the burden of proving every element of a crime beyond a reasonable doubt. *In re Winship,* 397 U.S. 358,

---

**3.** Justice Souter noted that when the issue involves an unconstitutional presumption that is necessary to establish the element of the crime, the appellate court must look to the facts considered in determining whether to apply the presumption. If the presumption is not itself necessary to establish the element of the crime, but only one of a variety of facts sufficient to prove the necessary element, then the other evidence sufficient to prove the element should be identified. *Id.,* —— U.S. at —— n. 9, 111 S.Ct. at 1893 n. 9. If the evidence thus identified under either alternative, and "presumably considered by the jury in accordance with the instructions," is "so overwhelming as to leave it beyond a reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption," then the error could be held to be harmless beyond a reasonable doubt. *Id.,* ——

U.S. at —— –——, 111 S.Ct. at 1893–94. In either case, it is necessary to demonstrate that the jury could have actually considered that evidence in its determination that the element of the crime was established.

**4.** The Government argues that the jury's verdict indicated that Gaudin acted with the intention of influencing the agency and that the facts necessary to establish intent also necessarily established materiality. First, we observe that facts bearing on intent would not necessarily bear on the materiality issue. Even more important, the jury did not, as required by *Yates,* consider those facts under an appropriate instruction in determining the element of materiality, because that issue was removed from the jury's consideration.

364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). When a trial judge deprives the jury of its fact-finding duty, this violates the defendant's due process rights. *Carella,* 491 U.S. at 265, 109 S.Ct. at 2420; *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). We found it to be constitutional error when an element of the offense charged was omitted from the jury instructions in *Martinez,* 937 F.2d at 423. As in the *Martinez* case, the jury in this case was deprived of its fact-finding duty because the trial judge withdrew the element of materiality from the jury and stated that it existed as a matter of law. For the same reasons expressed in *Martinez,* this violated the defendant's due process rights. This error "seriously affected the fairness" of the proceedings, *see Young,* 470 U.S. at 15, 105 S.Ct. at 1046, and constitutes plain error.

### IV. *Conclusion*

Because the element of materiality was removed from jury consideration for the crimes charged in Counts 2–17, 19–42, and 44–46, the convictions on these counts must be reversed. Because of the reversal on this ground, we need not address the other issues raised as to those counts. In the appellant's brief on appeal, sufficiency of the evidence was identified as an issue only in the equity skimming charge. In the body of the brief, however, some discussion exists with regard to the sufficiency of the evidence concerning these counts under section 1001. Our review of the evidence indicates that the evidence was clearly sufficient for a conviction on these counts, had the jury been properly instructed on the issue of materiality.

**The conviction on Count 1, equity skimming, is AFFIRMED. The convictions on Counts 2–17, 19–42, and 44–46 are REVERSED and REMANDED for further proceedings in accordance with this opinion.**