## A03A2059. HOWELL v. THE STATE.
(597 SE2d 546)

PHIPPS, Judge.

Lance Hugh Howell appeals his convictions of driving under the influence of alcohol with an unlawful blood-alcohol concentration and of being in possession of an open container of an alcoholic beverage while operating a motor vehicle. He contends that the trial court erred in (1) denying his motion to suppress the results of a state-administered breath test, (2) instructing the jury that he had the

---

burden of showing any human errors in the administration or interpretation of field sobriety evaluations, and (3) denying his plea of double jeopardy. Finding merit in Howell's first claim of error, we reverse his convictions.

"On review, this Court will uphold a trial court's findings as to disputed facts in a motion to suppress unless clearly erroneous, whereas the trial court's application of the law to undisputed facts is subject to de novo appellate review. [Cit.]"[1] In this case, the facts are not disputed.

State's evidence showed that at around 1:00 a.m. on February 8, 2002, Cherokee County Deputy Sheriff Carl Pope was on patrol when he observed Howell operating a truck in violation of various rules of the road. As a result, Pope initiated a traffic stop. Upon speaking to Howell, Pope detected a strong odor of an alcoholic beverage. After Howell admitted to Pope that he had consumed some beer, Pope conducted a DUI investigation by having Howell blow into an alco-sensor machine and perform various field sobriety tests. Pope thereupon concluded that Howell was too impaired to operate a motor vehicle safely and arrested him for DUI. While conducting an inventory of Howell's truck, Pope found an open can of beer.

Pope gave Howell implied consent warnings and asked him to submit to a state-administered breath test. Howell said no. Pope, however, testified that through his training and experience, he has "always been taught to put them [DUI arrestees] in front of the machine to consider that a refusal. And I don't take the answer no on the scene." Consequently, Pope placed Howell in his patrol car and transported him to the Cherokee County Adult Detention Center where he asked City of Holly Springs Police Officer Rodney Campbell to administer an Intoxilyzer 5000 test. Campbell did so, and Howell's breath samples registered 0.179 and 0.180 grams. Although Campbell could not recall his conversation with Howell, he testified that he normally advises suspects that the Intoxilyzer 5000 is a state test, that they need to blow into the machine, and that "if they are not blowing, then that's consider[ed] a refusal." Campbell did not recall that he deviated from that protocol in this case or that Howell refused to cooperate.

1. (a) In reliance on *State v. Highsmith*,[2] Howell first contends that the trial court erred in denying his motion to suppress the results of the Intoxilyzer breath test. We agree.

In *Highsmith*, the arresting officer read the defendant implied consent warnings and asked him to submit to a blood test. The officer

---

[1] *State v. Langlands*, 276 Ga. 721 (1) (583 SE2d 18) (2003).
[2] 190 Ga. App. 838 (380 SE2d 272) (1989).

testified that the defendant initially expressed reluctance to having needles stuck in him and refused testing, but that he engaged the defendant in further conversation and persuaded him to consent. Applying a "totality of the circumstances" test as would be proper in determining whether a confession is freely and voluntarily given, the trial court granted Highsmith's motion to suppress the results of the blood test. We reversed.

We recognized in *Highsmith* that in Georgia, the state may constitutionally take a blood sample from a defendant without his consent and that our implied consent statute thus grants a suspect an opportunity, not afforded him by our constitution, to refuse to take a blood-alcohol test.[3] Therefore, we found it improper to apply a "totality of the circumstances" test in determining the validity of a defendant's decision to rescind his refusal to submit to state-administered testing. In *Highsmith*, we concluded that "[t]he issues to be determined are simply whether the officer told the suspect of his implied consent rights in a timely fashion, and whether the suspect revoked the implied consent."[4] We further held, however, that "[a]s with any procedure, the court must evaluate the officer's actions to determine if the officer acted reasonably in the situation and whether the procedure was applied in a fair manner."[5] Finding it clear from the record that the officer in *Highsmith* had not acted unreasonably, we held that the results of the test should have been admitted in evidence.

In this case, upon being read implied consent warnings by one of the arresting officers, Howell unequivocally revoked his implied consent. Without engaging Howell in further discourse, Pope arrested him and transported him to a police station where he directed another officer to administer the breath test. The second officer instructed Howell to blow into the breath testing device. There is no evidence Howell was asked a second time whether he would consent to a state-administered test and no evidence that he rescinded his refusal and thereafter consented. He was thus administered a breath test simply because he did not refuse to cooperate.[6] We cannot deem such a procedure to be fair or such actions by an officer to be reasonable. Consequently, the trial court erred in denying Howell's motion to suppress.

(b) According to the dissent, testimony given by Campbell could support a finding that Howell actually requested the breath test. The

---

[3] Id. at 839.

[4] (Citations omitted.) Id.

[5] Id.

[6] Compare *Deering v. State*, 168 Ga. App. 835, 836 (2) (310 SE2d 720) (1983) (where the defendant signed a consent to have his blood drawn).

trial court, however, did not find that Howell actually requested the test. The state does not argue that Howell requested the test. A review of the totality of Campbell's testimony reveals why.

Campbell testified on direct examination by the prosecuting attorney that he was at the detention center at the time in question because he had been "requested by another officer to run the Intoxilyzer." Campbell then proceeded to testify that, "[w]hat transpired into the test was, Deputy's Pope's arrest and — . . . his prisoner's request for the Intoxilyzer." At that point, it certainly appeared as though Campbell might have been testifying that Howell requested the test. But the trial court immediately interjected and asked Campbell exactly "what was said and by who and what." Campbell then responded that he did not recall any conversation and only recalled running the test. In response to further questioning by the court as to whether he recalled Howell "saying or doing anything that might give you an indication about whether he wanted to take the test or didn't want to take the test," Campbell testified that he would not have administered the Intoxilyzer breath test (which, Pope testified, he had asked Campbell to run) if Howell had refused to take the test and that he did not recall Howell ever requesting an independent test.

Later on cross-examination, defense counsel asked Campbell whether he would have given Howell a test if Pope had told him that Howell had previously refused to submit to testing. Campbell responded, "If *he* requested one, yes, sir." (Emphasis supplied.) In the context of the entirety of his testimony, it certainly would appear that Campbell's utterance of the word "he" was a reference to Pope and not Howell. Nonetheless, defense counsel then asked Campbell, "Well, when was it that Mr. *Howell* requested the test?" (Emphasis supplied.) Campbell then responded that it was approximately 2:00 a.m. and that if he (Campbell) gave the test, "they" requested it.

Neither the state nor the trial court interpreted either the testimony given by Campbell on direct examination, or his ambiguous responses to defense counsel's confusing line of questioning on cross, as evidence that Howell actually requested that he be given the breath test.[7] The state claims, without citation to the record, that upon arrival at the jail, Howell "was asked again whether he wished to submit to a state-administered test of his breath" and that he consented. In ruling on Howell's motion to suppress, the trial court

---

[7] In our opinion, finding the existence of such evidence would require us to change our "role from disinterested decision-maker to appellate advocate reviewing a trial record for error." *Rowland v. State*, 264 Ga. 872, 874 (1) (452 SE2d 756) (1995).

remarked that Howell was "sat down in a chair and just told to blow." The court denied the motion to suppress on grounds that although Howell initially refused to take the test, and although there was no evidence that he rescinded his initial refusal by actually requesting a test, there was also no evidence that he was coerced into taking the test. In so ruling, the court specifically noted that "while I don't have any direct evidence that he [Howell] specifically said now I want to take the test, I don't have any evidence to the contrary that he was coerced or forced to do it. . . ." When defense counsel pointed out that the State had presented no evidence that Howell had ever given the officers any indication that he had ever changed his mind, the court responded, "Other than he took the test."[8] In the order denying Howell's motion to suppress, the trial court ruled that he had "consented to" the state-administered breath test.

In *Dept. of Public Safety v. Seay*,[9] cited by the dissent, the defendant refused testing but then reconsidered and made affirmative requests for a test. The requests were denied as untimely, and the defendant's driver's license was suspended in administrative proceedings because of his refusal to take the state-administered test. Considering evidence that the defendant in fact had rescinded his refusal to submit to testing in a timely manner, the superior court reversed.

In affirming the superior court's decision, we noted that no Georgia decisions had articulated any guidelines for determining whether a refusal to submit to a state-administered chemical test has been properly rescinded. In *Seay* we approvingly cited *Standish v. Dept. of Revenue, Motor Vehicle Div.*,[10] wherein the Supreme Court of Kansas

> declared that in order to be effective, a subsequent consent after a refusal to take a chemical test must be made: "(1) within a very short and reasonable time after the prior first refusal; (2) when a test administered upon the subsequent consent would still be accurate; (3) when testing equipment is still readily available; (4) when honoring the request would result in no substantial inconvenience or expense to the police; and (5) when the individual requesting the test has

---

[8] Defense counsel then argued that actual coercion should not have to be shown because a police station is an inherently coercive setting. Although *Miranda v. Arizona* is based on just such a theory, the trial court rejected defense counsel's argument.

[9] 206 Ga. App. 71, 72 (1) (424 SE2d 301) (1992).

[10] 235 Kan. 900, 902-903 (683 P2d 1276, 1280) (1984).

been in the custody of the arresting officer and under observation for the whole time since arrest."[11]

We adopted these guidelines as our own.

The guidelines adopted in *Seay* thus assume that in order for rescission of a refusal to submit to state testing to be effective, the defendant must affirmatively request that a test be given. Under *Highsmith*, however, that is not an inflexible requirement. *Highsmith* requires only that the procedure utilized by the officer in attempting to persuade a defendant to rescind his refusal be fair and reasonable. Merely sitting the defendant down and telling him that he needs to blow into the machine, as found by the trial court, can hardly be considered a fair and reasonable procedure.

According to the dissent, Howell was informed by the implied consent warnings that he had a right to refuse testing. In this regard, Pope testified that he read Howell the implied consent notice for suspects age 21 or over. That notice is set forth in OCGA § 40-5-67.1 (b) (2), which provides:

> Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your (designate which tests) under the implied consent law?

(Punctuation and emphasis omitted.) Howell said no. Unlike the defendant in *Highsmith*, he was not even asked to reconsider his decision. He was simply told, later, that he needed to blow into the

---

[11] 206 Ga. App. at 73 (1).

machine and that his failure to do so would be considered a refusal. Because that procedure can hardly be considered reasonable, Howell's consent to testing was not validly obtained.

2. Howell contends that the trial court erred in instructing the jury that "[f]ield sobriety evaluations, as with any other form of evaluation, may be subject to human error in their administration or interpretation, and the burden of showing such errors rests with the party who is challenging the weight of said evidence." Howell argues that this jury charge was unconstitutionally burden-shifting under *Sandstrom v. Montana*.[12] We find no merit in this argument.

In *Sandstrom*, the United States Supreme Court held that a reasonable juror could have interpreted the instruction that the law presumes that a person intends the ordinary consequences of his voluntary acts in either of two impermissible ways.[13] First, it was held that a reasonable juror could have interpreted the instruction as a mandatory or conclusive presumption which would relieve the state of the burden of proving an element of the crime.

> Second, the Supreme Court in *Sandstrom* held that the jury may have interpreted the instruction "as a direction to find intent upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence — thus effectively shifting the burden of persuasion on the element of intent." [Cit.]
>
> Thus, the Court indicated that it would not be constitutionally impermissible merely to require the defendant to come forward with some evidence contrary to the presumption, i.e., to place on the defendant a burden of producing evidence or a burden of production. However, the Supreme Court held that the jury in Sandstrom's case could have interpreted the presumption referred to in the complained-of instruction as meaning "that upon proof by the State of the slaying, and of additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state." [Cit.] Such a presumption, said the Court, is constitutionally infirm under *Mullaney v. Wilbur*[14] and *Patterson v. New York*,[15]

---

[12] 442 U. S. 510 (99 SC 2450, 61 LE2d 39) (1979).

[13] *Williams v. Kemp*, 255 Ga. 380, 381 (338 SE2d 669) (1986).

[14] 421 U. S. 684 (95 SC 1881, 44 LE2d 508) (1975).

[15] 432 U. S. 197 (97 SC 2319, 53 LE2d 281) (1977).

as well as *In re Winship*.[16] . . ."[17]

The jury instruction in this case did not relate to any element of the crime. It was merely an application of the principle, as contained in OCGA § 24-4-1, that the burden of proving a fact generally lies upon the party who is asserting it. The charge was not burden shifting under *Sandstrom*.

3. Howell contends that his double jeopardy plea should have been sustained, because the trial court without manifest necessity declared a mistrial at the first trial instead of ordering a continuance.

Howell's case initially came on for trial in September 2002. During the course of the trial, the prosecutor's office came into possession of an arrest booking form in which one of the law enforcement officers at the detention center had noted that Howell did not appear to be under the influence of alcohol or drugs. The prosecutor promptly provided defense counsel with this exculpatory material. Upon being informed of the matter, the court immediately told defense counsel that it was inclined to grant a continuance but not a mistrial. Defense counsel thereupon moved for a continuance. After some discussion, the court announced that it was going to excuse the jury and call the case back for trial in October before another jury. The court then summoned the jurors into the courtroom and excused them. Afterward, the court conferred with defense counsel to ensure that he would be available for the call of the case the following month, and defense counsel assured the court that he would. But defense counsel later filed a motion to dismiss on account of former jeopardy. At the beginning of the second trial, the court denied the plea.

Although the court announced its intent to grant a continuance at the first trial, it in effect declared a mistrial by excusing the jury and ordering that the case be retried before another jury.

> Once a jury is impaneled and sworn, jeopardy attaches and a defendant is entitled to be acquitted or convicted by that jury. If a mistrial is declared without the defendant's consent or over his objection, he may be retried only if there was a manifest necessity for the mistrial. If a defendant consents to a mistrial, he may not later use the mistrial as the basis of a plea of double jeopardy. Consent to the grant of a mistrial can be express or implied.[18]

---

[16] 397 U. S. 358 (90 SC 1068, 25 LE2d 368) (1970).

[17] *Williams*, 255 Ga. at 381.

[18] (Citations omitted.) *Akery v. State*, 237 Ga. App. 549, 550 (515 SE2d 853) (1999).

The transcript of Howell's first trial reflects that, while the jurors were outside the courtroom, the trial court announced its intention to excuse them and then summoned them into the courtroom and told them they could leave. Defense counsel had an opportunity to raise an objection after the court announced its intention to excuse the jurors and before they were returned to the courtroom. He did not. Therefore, the court was authorized to find that Howell, through counsel, impliedly consented to the grant of the mistrial. For this reason, we cannot say that his plea of double jeopardy was improperly denied.

For the reasons given in Division 1, the judgment is reversed.

*Judgment reversed. Smith, C. J., Ruffin, P. J., Miller and Ellington, JJ., concur. Andrews, P. J., and Blackburn, P. J., dissent.*

BLACKBURN, Presiding Judge, dissenting.

Under the applicable standard of review in this case regarding the trial court's denial of Lance Hugh Howell's motion to suppress the results of an Intoxilyzer 5000 breath test given after a proper recitation of implied consent rights,[19] there is only one legal question now before this Court: "Viewed in the light most favorable to the judgment, does the evidence support the trial court's explicit factual determination in its order that Howell voluntarily consented to the breath test?" As I believe that the evidence does support the trial court's finding that Howell voluntarily consented to the breath test, I must respectfully dissent.

Following the trial court's denial of his motion to suppress the results of his Intoxilyzer 5000 breath test, Howell appeals, contending that: (1) being taken into the room housing the Intoxilyzer 5000 machine after his refusal to take the test at the scene of the stop was inherently coercive and invalidated his subsequent consent to provide a breath sample; and (2) the State failed to show that he unambiguously retracted his initial refusal at the scene of the stop to take the Intoxilyzer 5000 test. For the reasons set forth below, these contentions are without merit.

"In reviewing the grant or denial of a motion to suppress, we must construe the evidence most favorably to uphold the findings and judgment of the trial court, and that court's findings as to disputed facts and credibility must be adopted unless clearly erroneous." *Viau v. State*.[20] If there is evidence of record which supports a finding of

---

[19] On a motion to suppress, the State bears the burden of showing that implied consent warning requirements have been met. See, e.g., *Miller v. State*, 238 Ga. App. 61 (516 SE2d 838) (1999). Under OCGA § 40-5-67.1 (b), the implied consent notice must be given "[a]t the time a chemical test or tests are requested." In this case, Howell makes no contention that the implied consent warning was given improperly, and the record would not support any such argument even if it had been made.

[20] *Viau v. State*, 260 Ga. App. 96, 100 (3) (579 SE2d 52) (2003).

voluntary consent, we must affirm, even in close cases such as this one where the facts were vigorously disputed in the trial court below. In addition, as it is undisputed that the proper implied consent warning was read to Howell, we must narrowly focus our review on whether any evidence of record supports the trial court's factual determination that the defendant's decision to consent to the breath test was voluntary.

In its order, the trial court explicitly determined that "[Howell] consented to a State administered test of his breath, which Officer Campbell administered on the Intoxilyzer 5000 at the Cherokee County Adult Detention Center." Viewed in the proper light and under the correct standards, the evidence of record shows that, during the early morning hours of February 8, 2003, Deputy Sheriff Carl Pope stopped Howell for operating his car without an operable tag light and for weaving while driving. As Deputy Pope approached Howell, he detected the strong odor of an alcoholic beverage, and, upon questioning, Howell admitted that he had been drinking that evening. Deputy Pope then asked Howell to step out of the car, and as Howell did so, an empty beer can fell to the ground. A later search of the car produced five empty beer cans, one partially consumed can, and a new twelve-pack.

Once out of the car, Howell consented to certain field sobriety tests, which he failed. In addition, Howell agreed to an Alco-Sensor III test[21] which produced a positive result for alcohol consumption. At this point, Deputy Pope concluded that Howell was too impaired to operate a motor vehicle safely and placed him under arrest. Deputy Pope then correctly read Howell the statutory implied consent warning and requested that he submit to the State-administered breath test. It is uncontested on appeal that Deputy Pope properly read Howell the requisite warning at the appropriate time.

Following the warning, Deputy Pope asked Howell to submit to a State-administered breath test, but Howell initially refused to do so. Howell was then taken to the police station. After completing the booking process, Howell was turned over to Officer Rodney Campbell some time after his initial arrest. Deputy Pope testified that he turned Howell over to Officer Campbell in order to allow Howell a second chance to submit to the State's breath test, as was his general procedure. Neither Deputy Pope nor Officer Campbell said anything to Howell which could be considered coercion to consent to the test.

Officer Campbell then accompanied Howell to the Intoxilyzer 5000, where Officer Campbell advised Howell, among other things,

---

[21] The Alco-Sensor III is a field screening device used to assist officers in making preliminary findings in a DUI investigation.

that if he did not properly blow into the machine, it would be considered a refusal to take the test. At that time, of course, Howell had already been informed once that he had the right to so refuse, and there is absolutely no evidence of record indicating that Howell did not fully understand this right.

During direct examination, Officer Campbell was questioned about the events surrounding Howell's testing. The trial transcript states:

Q. Okay. On [February 8, 2002,] at approximately 2:15 a.m., did you administer an Intoxilyzer 5000 test to the Defendant[,] Mr. Lance Howell here at the table?

A. Yes, sir.

Q. Okay. If you will, explain to the Court what brought that about. Why were you at the A.D.C., the Cherokee County Adult Detention Center, at that time and what brought Mr. Howell into your direction.

A. I was at the Adult Detention Center for one of two reasons, and I cannot recollect exactly why. The first being to transport a prisoner of my own, and the second, being requested by another officer to run the Intoxilyzer.

Q. All right.

A. What transpired into the test was, Deputy Pope's arrest and —

Q. (Interposing) Sure.

A. — his *prisoner's request* for the Intoxilyzer.

(Emphasis supplied.)

Then, during cross-examination by Howell, Officer Campbell further testified as follows:

Q. [D]o you, now, today, remember February the 8th when Mr. Howell came into the jail?

A. I remember his face, yes.

Q. Okay. But do you remember what [Deputy] Pope[, the arresting officer,] told you?

A. No.

Q. Did [Deputy] Pope tell you that he had refused [to take the State-administered breath test] out on the street?

A. I don't recall. I don't remember.

Q. Okay. Well, would you have given him a test if [Deputy] Pope had told you he refused?

A. If he requested one, yes sir.

Q. Well, when was it that *Mr. Howell* requested the test?

A. Whatever time — around 2:00 a.m. on the ticket. If I gave them the test, they requested it.

(Emphasis supplied.)

Next, the trial court asked the officer conducting the test a series of questions as follows:

Q. Right. Okay. So, you don't — do you recall the Defendant ever refusing to take the test at the A.D.C., in your presence, to you — ever refusing to take it to you?
A. No, sir. If he had refused, there would be no sample.

Applying our standard of review to these facts, we cannot say that the trial court erroneously determined that Howell voluntarily consented to the breath test.

As an initial matter, there is no question in this case whether Howell consented to the breath test. He did so. It is an undisputed fact that he made the decision to blow into the Intoxilyzer 5000 and provide the State with a breath sample after being told twice that he had the right to refuse to do so. At the moment that Howell blew into the machine, he, in fact, consented to the test. The only relevant question remaining is whether Howell's consent to take the test, which is undisputed, was voluntary and not the product of duress or coercion *at the time of the consent.* See *Leiske v. State*[22] (affirming trial court's denial of motion to suppress where defendant was read implied consent warning twice and evidence in record supported finding of voluntary consent). Thus, it is ultimately irrelevant to our determination whether Howell explicitly requested the subject test, as long as his consent was voluntary.

Howell's earlier refusal to take the test when his car was initially stopped also does not control the ultimate conclusion of whether his consent was voluntary.

In *State v. Highsmith*,[23] this court rejected the argument that once a suspect indicates to an officer that he refuses to submit to a blood-alcohol test, the matter is closed. "Such a rigid rule," we said, "would not be consistent with the approach our courts have followed in applying the statute. . . ." Id. at 839. It is therefore clear that Georgia law recognizes the possibility that an individual may rescind his or her refusal to submit to an intoximeter test.

---

[22] *Leiske v. State*, 255 Ga. App. 615, 616 (2) (565 SE2d 925) (2002).
[23] *State v. Highsmith*, 190 Ga. App. 838 (380 SE2d 272) (1989).

*Dept. of Public Safety v. Seay.*[24] In *Highsmith,* where we affirmed the conviction, the plaintiff was asked three times to submit to a blood test after initially refusing the test. Again, the issue we must resolve is whether the consent to take the test was voluntary *at the time the test was taken.*

This evidence of record cited above supports the trial court's finding that Howell, who knew of his right to refuse and had been reminded of it twice, *voluntarily* consented to the Intoxilyzer 5000 test. Howell consented to the test, and there is no evidence that he was coerced to do so. As a result, our standard of review requires that we affirm the trial court's denial of Howell's motion to suppress. Moreover, the testimony of record could also support a finding that Howell actually requested the test, although this finding would not be necessary to the trial court's finding that the consent was voluntary and not coerced.

1. Nonetheless, Howell contends that his consent to take the Intoxilyzer 5000 test must be considered involuntary, arguing that the act of being taken into the Intoxilyzer 5000 room after he initially refused the test at the scene of the stop was inherently coercive. We cannot agree.

Our Supreme Court's ruling in *Woodruff v. State,*[25] is instructive on this matter. In *Woodruff,* the defendant filed a motion to suppress evidence found in a car following a consent to search, contending that "the natural emotional upset experienced by a wrongdoer apprehended in her automobile by the police, is sufficient to render involuntary any consent given to search." Id. at 844 (3). In response, our Supreme Court stated: "We cannot agree that this is a correct statement of the law. The facts present here do not show duress, and under the totality of the circumstances, the trial court did not err in concluding that consent was voluntarily given." Id.

The same principles apply in this case. As noted above, the record now before us does not show duress. To the contrary, the record supports a finding that Howell knew his rights at the time the breath test was administered, and, right before he submitted to the test, he was reminded that refusals to take the test were possible. This situation, therefore, was not inherently coercive. In fact, Howell never testified that he actually felt coerced at any time, and the officers who performed the breath test testified that they did nothing to coerce Howell. Based on this evidence, the trial court, under the

---

[24] *Dept. of Public Safety v. Seay,* 206 Ga. App. 71, 72 (1) (424 SE2d 301) (1992).

[25] *Woodruff v. State,* 233 Ga. 840 (213 SE2d 689) (1975).

totality of the circumstances, did not err by concluding that Howell's consent was voluntarily given. *Woodruff*, supra.

2. Howell further contends that the trial court erred by denying his motion to suppress because the State failed to prove that he unambiguously retracted his refusal to take the breath test. This argument is wholly misplaced, however, as it does not comport with the applicable question of law now before us. As stated previously, there is no issue of whether Howell consented to the breath test, and there is absolutely no ambiguity about his decision to take it. The only issue remaining is whether that consent was voluntary at the time the test was taken, not whether he unambiguously retracted a refusal given some time earlier. By taking the test, Howell consented thereto, and there is no evidence to support a claim of duress or coercion. The trial court did not err in denying his motion to suppress.

The transcript provides clear evidence supporting the trial court's determination, and the trial court explicitly found in the text of its order that "the Defendant consented to a State administered test of his breath." Our concern is only whether the evidence supports the trial court's determination that this consent was voluntary. This explicit finding of fact is supported by the record. Only the written order of the trial court constitutes its ruling. Here, we are bound to affirm the trial court.

I am authorized to state that Presiding Judge Andrews joins in this dissent.

DECIDED MARCH 24, 2004.

*Weaver & Weaver, George W. Weaver, Jeffrey L. Floyd*, for appellant.

*David L. Cannon, Jr., Solicitor-General, Barry W. Hixson, Lawrence A. Silverman, Assistant Solicitors-General*, for appellee.