Filed 9/12/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br> A.W.,<br><br>    Defendant and Appellant. | G056266<br><br>(Orange Co. Super. Ct. No.18DL0129; Los Angeles Co. Super. Ct. No. MJ24129)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Fred W. Slaughter, Judge.  Affirmed in part and reversed in part with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

The court found it to be true that minor A.W. committed five counts of felony vandalism. (Pen. Code, § 594, subd. (a).)[1] The court declared minor a ward of the state and ordered him to serve 37 days in juvenile hall.

The sole question on appeal is whether the evidence supported a finding that, for each count, "the amount of defacement, damage, or destruction [was] four hundred dollars ($400) or more," as required to elevate the crime from a misdemeanor to a felony. (§ 594, subd. (b)(1).) The only competent testimony on that issue came from an employee of the City of Palmdale who helped prepare an analysis of the average cost to clean up an instance of graffiti.

We find three flaws in that testimony. First, the use of an average, by itself, was not enough to prove beyond a reasonable doubt that the amount of damage inflicted by *minor* was equal to the average cleanup cost, rather than some other number. The use of an average, or arithmetic mean, recognizes that cleanup costs for some graffiti is less than the average, and the cleanup costs for other graffiti exceeds the average. The average cleanup cost is untethered to the actual damage caused by minor. Second, the calculation included the cost of law enforcement, which, though proper in certain restitution settings, was not a proper consideration in assessing the damage minor inflicted under section 594. Third, Palmdale's methodology for calculating the average cost is flawed, for reasons we explain below. Accordingly, there was insufficient evidence that minor inflicted $400 or more in damages, and thus we reverse the adjudication in part with instructions to reduce the felony counts to misdemeanors.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

FACTS

Minor admitted to 22 taggings in the City of Palmdale.[2] The city workers who removed the graffiti took photographs of each instance and uploaded the photographs to a software program called Graffiti Tracker. Graffiti Tracker contains information about the size of the graffiti, the surface type, the removal method, the date the photograph was taken, and the date the graffiti was removed. The People submitted into evidence a printout from Graffiti Tracker for each of minor's taggings.

The detective who investigated the matter assigned a remediation cost of $545 to each incident based on Palmdale's grafitti restitution cost calculation (Cost Calculation). Ruth Oschmann, a crime prevention specialist for Palmdale, helped prepare the Cost Calculation. Because it is central to this appeal, we have attached a copy of the Cost Calculation as an appendix to this opinion. The Cost Calculation consists of two parts.

In the first part, Palmdale calculated the hourly rate of the various city employees involved in graffiti remediation, as well as the hourly rate of the supplies involved. The use of an "hourly rate" for supplies is itself a problematic concept, but was calculated by Palmdale by dividing the total annual cost of graffiti remediation supplies by the number of hours in a year, assuming a 40-hour workweek. In addition to supplies, hourly rates were calculated for the following categories: vehicles, staff time, Graffiti Tracker, and a Los Angeles Sheriff Department graffiti investigator (Palmdale pays for a full-time investigator). The hourly rates for each of those categories were added together to come up with a total hourly rate of $327.32 for cleaning graffiti. That was then divided by 60 to come up with a per minute rate of $5.45.

---

[2] "Tagging is the term for marking walls and surfaces with graffiti." (*In re Angel R.* (2008) 163 Cal.App.4th 905, 912, fn. 6.)

In the second part of the Cost Calculation, the average amount of time devoted to various tasks associated with graffiti removal was listed and assigned an average number of minutes to complete the task. The tasks listed, with minutes in parentheses, are: work order preparation (5), equipment preparation time (20), travel time to location (20), time spent at each individual location for graffiti removal (25), vehicle and equipment clean up time (20), and incident report log preparation time (10). The total is 100 minutes. The average minutes (100) were then multiplied by the per minute rate ($5.45) to arrive at an average cost of $545 to clean up a single instance of graffiti. This figure does not take into account the size of the graffiti, but according to Oschmann, the additional time it takes to paint over larger graffiti is insignificant. Most of the time is spent preparing, traveling, setting up, and cleaning up. Oschmann had no personal knowledge of the graffiti perpetrated by minor.

At the conclusion of the hearing, minor's counsel argued the evidence was insufficient to prove minor had inflicted $400 or more in damages for each count. The court, without comment on that issue, found the charges to be true beyond a reasonable doubt. Minor appealed.

## DISCUSSION

Every person who maliciously "[d]efaces with graffiti or other inscribed material" (§ 594, subd. (a)(1)) "with respect to any real or personal property not his or her own . . . is guilty of vandalism" (*id*., subd. (a)). "If the amount of defacement, damage, or destruction is four hundred dollars ($400) or more, vandalism is punishable" as a felony. (§ 594, subd. (b)(1).) The sole issue on appeal is whether the People carried the burden of proving the amount of damages was $400 or more. We review this issue for substantial evidence. Minor contends Oschmann's testimony about the *average* cost of cleaning up an instance of graffiti was insufficient to meet the People's burden of proving

4

that the damage inflicted by minor was $400 or more. We agree for three reasons. First, simply reciting an average remediation cost is inadequate to establish the specific amount of damage minor inflicted. Second, Oschmann's testimony about the average cost included law enforcement costs, which was improper. Finally, Palmdale employed a flawed methodology in calculating its average costs.

*The People Must Establish the Specific Damages Caused by Minor*

Much of the statutory and case law touching on the issue of damages for vandalism arises in the context of restitution, and the People rely heavily on this area of the law to support the court's ruling. To provide some context for the People's position that citing the average cost of clean up is sufficient, we begin by setting forth the two statutory schemes for restitution that apply in graffiti cases, one of which does permit the use of averages. We then explain why that statutory scheme cannot apply here.

The first restitution statute that applies in graffiti cases is the Graffiti Removal and Damage Recovery Program (Graffiti Program). (Welf. & Inst. Code, § 742.10 et seq.) The Graffiti Program has two aims: (1) to aid cities and counties in recouping the costs of cleaning up graffiti (*id.*, subd. (b)), and (2) "[t]o safeguard the fiscal integrity of cities and counties by enabling them to recoup the *law enforcement costs* of identifying and apprehending minors who deface the property of others with graffiti or other inscribed material" (*id.*, subd. (c), italics added).

The Graffiti Program implements these aims by permitting a city or county, by ordinance, to elect to have a probation officer recoup the municipality's *average costs* for the following two categories (Welf. & Inst. Code, § 742.14, subd. (a)): (1) "the average costs per unit of measure incurred *by the law enforcement agency* with primary jurisdiction in the city, county, or city and county *in identifying and apprehending*" the minor (*id.*, subd. (b), italics added); and (2) "the average cost to the city [or] county . . . per unit of measure *of removing* graffiti and other inscribed material, and of *repairing*

5

*and replacing property* of the types frequently defaced with graffiti or other inscribed material that cannot be removed cost effectively" (*id*., subd. (c), italics added). If a minor contends that the use of averages does not reflect the damage actually caused, the minor is entitled to a hearing to raise that issue, but the burden is on the minor: "[T]here shall be a presumption affecting the burden of proof that the findings of the court . . . represent the actual damages and costs attributable to the act of the minor . . . ." (Welf. & Inst. Code, § 742.16, subd. (h).)

The second restitutionary scheme is the more general statute, Welfare & Institutions Code section 730.6, which provides for restitution "in the amount of the losses," which "shall be of a dollar amount sufficient to fully reimburse the victim or victims for all determined economic losses incurred as the result of the minor's conduct" (*id*., subd. (h)(1)), and which shall include "the actual cost of repairing the property when repair is possible" (*id.*, subd. (h)(1)(A)). Under this scheme the court has broad discretion to award restitution, provided the evidence establishes a "factual nexus" between the amount sought and the evidence of minor's actual conduct. (*Luis M. v. Superior Court* (2014) 59 Cal.4th 300, 309 (*Luis M.*).)

What sets these two statutory schemes apart is that the Graffiti Program permits the recovery of average costs, as well as law enforcement costs associated with investigating graffiti. In contrast, "[a]wards under [Welfare & Institutions Code] section 730.6 are based on proof of the damage actually linked to *the minor's conduct* and do not include investigative costs." (*Luis M.*, *supra,* 59 Cal.4th at p. 307.) But even under Welfare and Institutions Code section 730.6, "the court need not ascertain the exact dollar amount of the City's losses," provided "its calculation [has] some factual nexus to the damage caused by the minor's conduct." (*Luis M.,* at p. 309.) Elsewhere our high court described this inquiry as a "rational estimate of costs." (*Ibid.*)

Neither of these statutory restitution schemes can provide an adequate basis for determining whether the People have satisfied their burden of proving $400 or more

6

in damages under section 594. It is axiomatic that the elements of a crime must be proved beyond a reasonable doubt. (*In re Winship* (1970) 397 U.S. 358, 361.) Accordingly, the People must prove beyond a reasonable doubt that minor *in fact* inflicted damages of $400 or more. This requirement is wholly inconsistent with Welfare and Institutions Code section 730.6, the more general restitution statute, which requires only a factual nexus, or rational estimate. The People must *prove* the elements of the crime, not approximate them.

This requirement also precludes the use of a generic average for proving $400 or more in damages under section 594, as would be permitted under the Graffiti Program. The fundamental problem with the use of an average is that it leaves unanswered the following basic question: What if the damage here was below the average? One might imagine a hypothetical scenario where a minor tags the wall right outside the maintenance worker's office, such that the worker simply has to step outside with a can of paint and a brush and spend two minutes covering it up. The use of an average in that scenario would work a clear injustice. Fundamentally, the use of an average, without more, can result in a conviction for crimes that others committed.

This is not to say that averages and estimates are completely irrelevant. For example, hypothetically, if it were proved that the average cost of remediating graffiti was $6,000, and in no event could it be remediated for less than $5,000, that would satisfy the element of $400 in damages. The average could also provide a useful starting point for an opinion on damages, provided there was additional evidence bearing on how minor's graffiti differed from the average case, and how those differences impacted *actual* costs. But it is not enough to simply cite the average cost, particularly where the average cost is relatively close to the $400 threshold.

*In re Kyle T.* (2017) 9 Cal.App.5th 707 is on point. There, as here, the People relied on a city's estimate of the average cost to remediate graffiti to supply proof that the minor had inflicted damages of $400. (*Id*. at pp. 710-711.) The court rejected

7

that approach, disparaging the average cost as a "generic, one-size-fits-all removal cost of $400 for every incident of graffiti on City-owned property. . . . [T]his mechanistic flat rate seems to control the City's damages calculation in all cases, regardless of the particulars of a given incident, such as the graffiti's dimensions, the type of material used in creating the graffiti, the nature of the surface on which the graffiti was written, and the method and manpower employed for cleaning up the graffiti. In short, the list reflects a generalized, non-case-specific damages estimate, not an estimate tethered to the facts of [the minor's] vandalism."[3] (*Id.* at p. 714, fn. omitted.)

Turning to the proof here, it is clear the People were improperly relying on Palmdale's average cost estimate under the Graffiti Program to substitute as proof of the element of actual damages under section 594. (*Kyle T., supra,* 9 Cal.App.5th at p. 717 ["Welfare and Institutions Code section 742.14 does not authorize use of the average cost method beyond the restitution context"].) The detective who offered an opinion on damages based his testimony on the Cost Calculation. And the Cost Calculation reflects an average cost. It was not tailored to minor's particular case in any way. While there were some specific details of minor's offenses in the record—e.g. the size of the graffiti, and the type of surface it was on—no witness connected the dots by explaining what the average case consists of, how minor's offenses compared to the average case, and how any differences impacted the actual costs. Accordingly, the evidence was insufficient to prove minor inflicted damage of $400 or more.

---

[3] The People distinguish *Kyle T.* on the ground that, there, the cost sheet was not in evidence, nor were there photographs or any other specific evidence of the minor's vandalism. (*Kyle T., supra,* 9 Cal.App.5th at p. 711.) We agree that this is a point of distinction—here the evidentiary record is more complete—but we do not read *Kyle T.* as turning on those evidentiary failures. *Kyle T.* rejected a one-size-fits-all approach to calculating graffiti damages, and that is precisely what we have here: the use of an average as a substitute for an individualized damages calculation.

*Law Enforcement Costs Cannot Be Counted in Calculating Damages*

Even if the average remediation cost were proof enough, the evidence here suffered from another fatal flaw: It included the costs of law enforcement. Law enforcement costs cannot be included in calculating damages under section 594.

On this point, the discussion in *Luis M.*, *supra*, 59 Cal.4th 300 is instructive. Although *Luis M.* was a restitution case, it arose in the context of the more general restitution statute, Welfare and Institutions Code section 730.6. That statute permits recovery of the "actual cost of repairing the property . . . ." (Welf. & Inst. Code, § 730.6, subd. (h)(1)(A).) Similarly, section 594 requires the People to prove the amount of "defacement, damage, or destruction," which we interpret to include the cost of repairing or replacing the vandalized property. While the two statutes are different in that the burden of proof is much higher under section 594, they cover roughly the same categories of costs. What makes *Luis M.* instructive is that in the context of Welfare & Institutions Code section 730.6, our high court held that law enforcement costs are *not* recoverable: "These general provisions do not authorize restitution orders for law enforcement investigative costs. [Citations.] 'Under the relevant case law and the statutory scheme, public agencies are not directly 'victimized' for purposes of restitution under Penal Code section 1202.4 merely because they spend money to investigate crimes or apprehend criminals.'" (*Luis M.*, at p. 305.) Instead, restitution is limited to the cost of repair, replacement, or restoration—these "direct abatement costs" do "not include the costs of investigation." (*Id.* at p. 310.) Given the similarities in the recoverable categories of costs, investigative costs also cannot be included in the damage calculation under section 594. (See *Kyle T., supra,* 9 Cal.App.5th at p. 713 ["As the People acknowledge, the standard of proof in a restitution case is less exacting than the standard of proof in a vandalism case. Thus, failure to meet the lower restitution standard would, by definition, mean failure to meet the standard of proof of the underlying crime"].) Moreover, unlike the Graffiti Program, which has a specific aim of helping cities and

9

counties recover investigative costs, and specifically permits them, section 594 contains no such provision.

Here, once law enforcement costs are excluded, employing the average cost method does not result in damages of $400 or more. Palmdale estimated an average hourly rate of personnel and supplies associated with graffiti remediation of $327.32. Of that amount, $118.91 was attributed to the deputy sheriff. Subtracting that amount results in an aggregate hourly rate of $208.41, which, when divided by 60, results in a per-minute rate of $3.47. Multiplying that rate by the average time to clean up graffiti, 100 minutes, results in an average cost of $347 per instance of graffiti. Thus, even assuming the People could meet its burden purely by utilizing a cost average, the People failed to meet that burden here.

*Palmdale's Cost Calculation is Flawed*

Third, and finally, we note a significant methodological flaw that inflated Palmdale's cost estimate. The method Palmdale employed was to add up the hourly rate of every cost associated with graffiti remediation to come up with an aggregate hourly rate. The problem with that approach is that it assumes that *every resource is being utilized for the entire hour*. Palmdale then divided its aggregate hourly rate by 60 to calculate an aggregate per-minute rate, which it then multiplied by 100 minutes. But again, the initial flaw persists: The method assumes that every resource is being utilized for the entire 100 minutes.

It is clear from Palmdale's descriptions of the various tasks associated with graffiti remediation that it could not have been utilizing all of its resources that entire time. For example, "Work Order Preparation and Time" is described as "Retrieving incident messages from the 'Graffiti Hot Line', individuals call-in's, WEB Submissions for graffiti removal, preparation of each Work Order and distribution to personnel." This description does not appear to require any vehicles, any of the supplies included in the

10

cost analysis, nor does it seem to involve a deputy sheriff. Yet the Palmdale average cost method charges five minutes for *all* of those unused resources. Another entry is for "Travel time to location," which, presumably, only involves the actual maintenance workers who remove the graffiti. Not the "Office Assistant II," nor the "Community Safety Supervisor," nor, especially Oschmann, the "Crime Prevention Officer" who testified that she does not go to view the actual graffiti in person. Yet the Palmdale average cost method reflects 20 minutes of travel time for those individuals even though, on average, that expense is not actually incurred. Thus, even if the use of a cost average was proper, and even if law enforcement costs could be included, Palmdale's flawed calculation would not prove that minor caused $400 or more in damages.

DISPOSITION

The judgment is reversed and remanded with directions to reduce the felony vandalism adjudications to misdemeanors and to enter a new disposition consistent with the reduction of the felony counts to misdemeanors.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.

11

# APPENDIX

| GRAFFITI REMOVAL RESOURCES | | Hourly rate |
|---|---|---|
| **Vehicles:** | | |
| Commercial rate of a 3/4 ton vehicle, based on Cal Trans Specifications | $ | 34.20 |
| | | |
| **Supplies:** | | |
| Annual cost of $64,000.00 which is divided by a 40 hour work week to obtain and hourly rate for supplies related to the removal of graffiti (i.e. Paint, chemicals, protective equipment, equipment for removal staff, brushes, rollers, airless paint sprayer, etc.) | $ | 30.76 |
| | | |
| **Staff Time:** | | |
| Includes Salary and Benefits | | |
| Park Maintenance Supervisor @ 10% of overall compensation | $ | 6.03 |
| Parks Leadworker @ 75% of overall compensation | $ | 33.72 |
| (2) Maintenance Worker II's @ $35.26 each | $ | 70.52 |
| Office Assistant II @ 15% of overall compensation | $ | 4.35 |
| | | |
| **ADMINISTRATIVE RESOURCES** | | |
| | | |
| **Graffiti Tracker:** | | |
| Online tool used to document and track evidence of graffiti crimes. The annual subscription cost is $30,000.00 which is divided by a 40 hour work week to obtain and hourly rate. | $ | 14.42 |
| | | |
| **LASD Graffiti Investigator:** | $ | 118.91 |
| | | |
| **Staff Time:** | | |
| Includes Salary and Benefits | | |
| Community Safety Supervisor at @ 10% of overall compensation | $ | 6.64 |
| Crime Prevention Officer @ 20% of overall compensation | $ | 7.77 |
| **TOTAL:** | $ | **327.32** |
| **Per Minute Cost:** | $ | **5.45** |

| TIME FACTORS: | Minutes: |
|---|---|
| **Work Order Preparation and Time:** | 5 |
| Retrieving incident messages from the "Graffiti Hot Line", individual call-in's, WEB Submissions for graffiti removal, preparation of each Work Order and distribution to personnel | |
| | |
| **Equipment Preparation time:** | 20 |
| Pre-trip vehicle safety check, equipment safety check, load any needed supplies into vehicle | |
| | |
| **Travel time to location:** | 20 |
| Estimated average travel time from City of Palmdale's Maintenance Center located on 3rd Street East, to each individual graffiti location. Time varies based on traffic and the difficulty in navigating some terrain to reach the graffiti | |
| | |
| **Time spent at each individual location for graffiti removal:** | 25 |
| Estimated average time spent painting over graffiti at a single location, photographing and documentation of evidence | |
| | |
| **Vehicle and equipment clean-up time:** | 20 |
| Clean-up of graffiti vehicle, spraying equipment, brushes and rollers upon return to Maintenance Center after completion of graffiti removal. Includes time to change colors in airless paint sprayer for various locations | |
| | |
| **Incident Report Log preparation time:** | 10 |
| Downloading pictures and entering removal information into the database and related paperwork | |
| **Total average time spent per incident:** | **100 minutes** |
| **Total average cost per incident @ $5.45 per minute rate:** | **$ 545.00** |

Revised December 15, 2016