# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58311-9-II |
| Respondent, | |
| v. | |
| KAITLYN T. STOLAROFF, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. — Kaitlyn Stolaroff was convicted of burglary in the second degree and violation of an anti-harassment order. On appeal, Stolaroff argues that insufficient evidence supports both of her convictions and challenges several of the trial court's findings of fact and conclusions of law for its verdict. We conclude the findings of fact are supported by substantial evidence, and those findings of fact support the trial court's conclusions of law. We also conclude that sufficient evidence supports Stolaroff's convictions. Accordingly, we affirm.

FACTS

I. BACKGROUND

Rose Kary and Ron Kary Sr. live with their son, Ron Kary Jr., in Ocean Park. The Karys have an outbuilding on their property known as "[t]he hut." Rep. of Proc. (RP) at 14. "The hut is directly outside the patio door," approximately six feet away from the Kary residence. RP at 14. The Karys use the hut as temporary lodging for fisherman. The hut has electricity, and there is a refrigerator, a bed, and a heater inside.

Ron Kary Jr. and Stolaroff previously dated, but they broke up in 2016. Stolaroff is homeless, and since 2016, she has broken into the hut on several occasions. While in the hut, Stolaroff would "run the heater." RP at 29. In one instance, the Karys had to physically remove Stolaroff from the hut because she refused to leave.

Because Stolaroff used the heater in the hut in the past, the Karys "threw the breaker" in the hut "so that there was no electricity going." RP at 29. The Karys did so to dissuade Stolaroff from staying in the hut.

On March 27, 2023, following an incident with Stolaroff in February, Mrs. Kary obtained a temporary anti-harassment order from the Pacific County Superior Court. Relevant here, the order prevented Stolaroff from "enter[ing], return[ing] to, knowingly com[ing] within, or knowingly remain[ing] within 1,000 feet" of Mrs. Kary and her residence. Ex. 20. Stolaroff was never served with the order prior to the events leading to her arrest.

II.     STOLAROFF'S ARREST

On April 2,[1] sometime in the morning, Mrs. Kary was sitting on her patio. Mrs. Kary was home alone at that time. While Mrs. Kary was on her computer, she observed Stolaroff "going into the hut." RP at 22. Stolaroff had gone around the back of the house to access the hut.

Mrs. Kary called 911 and reported Stolaroff's violation of the anti-harassment order to the police. Mrs. Kary also "called out to" Stolaroff from the patio and "told her it was time to leave." RP at 28-29.

---

[1] There are some instances throughout the record and briefing that state the incident occurred on April 3, 2023. We use April 2 because that is the date that was listed on the information, and it appeared more frequently in the record.

Pacific County Sheriff's Deputy Dustin Eaton responded to the 911 call. Mrs. Kary met with Eaton and escorted him to the backyard area. On their way to the hut, Mrs. Kary and Eaton found an extension cord that ran from the Karys' residence to the hut. Mrs. Kary did not plug in the extension cord, nor did she see who had plugged it in.

When Eaton approached the hut, "[t]he door was open," and "Stolaroff [was] on the bed." RP at 46. Eaton, who recognized Stolaroff from previous encounters at the Kary residence, inquired what Stolaroff was doing in the hut. Stolaroff replied that "her name wasn't Kaitlyn," and that she wanted Eaton to leave. RP at 46. Stolaroff tried to close the door, but Eaton put his foot in the threshold.

Stolaroff continued to say that "she was living in the hut for 30 days" and "[s]he was paying rent to [Mrs.] Kary's son." RP at 47. Eaton "stepped away and then [Stolaroff] shut" and "locked the door." RP at 47, 69. While Eaton was talking with Stolaroff, Mrs. Kary called her son and informed him of the situation.

Eaton called Sergeant Nicholas Zimmerman and "asked if [Zimmerman] could bring a copy of the Anti-Harassment Order." RP at 47. Eaton continued to try to get Stolaroff out of the hut with no success.

Zimmerman arrived with a copy of the anti-harassment order. Zimmerman "knock[ed] on the door" and "announced [his] presence" and that he worked for the Pacific County Sheriff's Office. RP at 69. Zimmerman notified Stolaroff that he had an anti-harassment "[o]rder issued by the [c]ourt," as well as "the distance requirements in [the] order." RP at 70.

In response, Stolaroff said "that she had not been notified by the Court of the Court Order, and that *she had 15 days to respond to the Order and did not have to abide by the parameters for those 15 days until the court date*." RP at 70 (emphasis added). Zimmerman reiterated that he had a valid order and that Stolaroff "needed to abide by the parameters set forth in the Order until" the hearing date. RP at 70.

Zimmerman asked Stolaroff to open the door so he could give the order to her, but Stolaroff was unresponsive. Zimmerman and Eaton attempted to open the door with "a key code," but "the deadbolt would not go back." RP at 71. Stolaroff was allegedly "holding the deadbolt throw shut from the inside." RP at 71.

Zimmerman and Eaton went back to Zimmerman's patrol vehicle "to write a search warrant to forcibly enter" the hut. RP at 71. Before finishing the warrant, Ron Kary Jr. arrived at the property and told Zimmerman and Eaton that he was "going to break the door open." RP at 71. Ron Kary Jr. "got a drill and drilled . . . the lock out." RP at 72.

Once Ron Kary Jr. drilled the lock out and opened the door, Zimmerman and Eaton took Stolaroff into custody. Mrs. Kary and the officers found "[c]ans of food, cans of Sprite soda[,] . . . tinfoil on the bed, with burn marks on it, [and] a torch lighter" in the hut. RP at 51.

Stolaroff was charged with one count of burglary in the second degree in violation of RCW 9A.52.030 and one count of willfully disobeying a civil anti-harassment order in violation of RCW 7.105.455(2)(b).

III.    STOLAROFF'S BENCH TRIAL

Stolaroff waived her right to a jury trial. At the bench trial, defense counsel moved to dismiss both charges after the State rested its case. Defense counsel argued that the hut constituted a dwelling, meaning Stolaroff should have been charged with residential burglary, not burglary in

the second degree. And regarding the violation of the anti-harassment order, defense counsel argued that Stolaroff could not violate an order that she was not previously served with prior to the April 2 incident.

The court denied defense counsel's motion. Regarding the violation of the anti-harassment order, the court held that "a reasonable tri[er] of fact could [have found] that [Stolaroff] had knowledge of a provision of a duly issued Order and willfully violated that provision." RP at 101. The court highlighted that Stolaroff acknowledged the existence of a temporary order as well as the fact that Zimmerman, who identified himself as a law enforcement officer, informed Stolaroff that he had a valid order that prohibited her from being on the premises.[2]

The trial court found Stolaroff guilty of both counts. In the court's findings of fact and conclusions of law, the court found that Stolaroff, "entered or remained unlawfully in the building[, and that] [m]ultiple individuals testified that she had been removed prior and she acknowledged that she did not have the right to be there. [But e]ven if she had entered legally, she certainly remained unlawfully in the building." CP at 9-10 (finding of fact (FF) 2).

The court also found that when engaging with Zimmerman, Stolaroff "was aware that there was some kind of order but she didn't believe that it was in place yet because there was some kind of court date that had yet to take place." CP at 11 (FF 11). The court determined that Zimmerman "conveyed some of the terms of the order to" Stolaroff, including "a distance no contact provision with [Mrs. Kary], that [Stolaroff] could not be at [Mrs. Kary's] residence, and that it was a court order." CP at 11 (FF 12). In light of this, the court observed that "[t]he information was conveyed

---

[2] Stolaroff does not challenge the denial of her motion to dismiss the burglary in the second degree charge on the grounds that she should have been charged with residential burglary. Because of this, we do not include additional facts regarding the trial court's decision denying Stolaroff's motion regarding the burglary in the second degree charge.

to [Stolaroff] in a manner sufficient to allow [her] to make a decision," and that Stolaroff "made that decision, . . . did not leave[,] and . . . was [in] violation of that order." CP at 12 (FF 13).

Regarding the extension cord, the court found that "hooking up the extension cord to the home and bringing in the electricity to the building," amounted to the "use of . . . power [and] was [a] theft of services." CP at 10 (FF 4). Additionally, the court found that "the extension cord was not placed there by the homeowner" which would not have made "sense because [the Karys] could just switch on the power at the breaker to" the hut. CP at 10 (FF 5).

The court ultimately concluded that Stolaroff "entered or remained unlawfully in a building on [Mrs. Kary's property] with the intent to commit a crime therein; theft of services." CP at 12 (conclusion of law (CL) 4). The court also concluded that Stolaroff "was aware of a valid anti-harassment order which restricted her from being at the property and she made the decision not to leave the property in violation of that order." CP at 12 (CL 5).

Stolaroff was sentenced to 10.5 months of confinement at the Pacific County Jail.

Stolaroff appeals.

ANALYSIS

I.     SUFFICIENT EVIDENCE SUPPORTS STOLAROFF'S CONVICTIONS

We review challenges to the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014).

To satisfy due process, the State must prove every element of the crimes charged beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed 2d 368 (1970). The test for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, *any rational trier of fact* could have found [the defendant] guilt[y] beyond a reasonable doubt." *State*

*v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (emphasis added); *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025).

We review all evidence in the light most favorable to the State. *Roberts*, 5 Wn.3d at 231. "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Therefore, the court must draw "all reasonable inferences from the evidence in favor of the State and against the defendant." *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). And we defer to the factfinder regarding "questions of credibility, persuasiveness, and conflicting testimony." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011); *Roberts*, 5 Wn.3d at 234-35.

When we evaluate the sufficiency of the evidence supporting a conviction, we consider circumstantial evidence to be as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see also O'Neal*, 159 Wn.2d at 506 ("Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient.").

We similarly "review challenges to a trial court's conclusions of law de novo." *Roberts*, 5 Wn.3d at 237. Following a bench trial, a trial court must enter written findings of fact and conclusions of law. *Id.* at 234; CrR 6.1(d). Unchallenged findings of fact are verities on appeal. *State v. A.M.*, 163 Wn. App. 414, 419, 260 P.3d 229 (2011). "Findings must address all ultimate facts and material issues that carry influence or are essential to the conclusions. Ultimate facts are the essential and determinative facts supporting a conclusion; they must support the conclusions of law." *Roberts*, 5 Wn.3d at 234 (internal citation omitted).

A.      Violation of the Anti-Harassment Order

Stolaroff argues that insufficient evidence supports her conviction for violation of an anti-harassment order because she was never served with the order prior to being arrested. To that end, Stolaroff challenges findings of fact 13 and conclusion of law 5, arguing that each were erroneous.[3] We disagree.

"Washington State has enacted six different types of civil protection orders." RCW 7.105.900(2). An anti-harassment protection order is one type of statutorily authorized civil protection orders. *Id.* When creating this type of order, the legislature found that "[s]erious, personal harassment through invasions of a person's privacy by an act, acts, or words showing an intent to coerce, intimidate, or humiliate [a] victim" was on the rise. RCW 7.105.900(3)(d).

When a court issues an anti-harassment order, "the respondent *may* not be subjected to the penalties . . . for a violation of the order *unless the respondent knows of the order*." RCW 7.105.455(1) (emphasis added); RCW 7.105.465(1). And when a respondent willfully disobeys a provision of an anti-harassment order, such action constitutes a gross misdemeanor. RCW 7.105.455(2). Relevant here, one of the provisions that can serve as a basis of a violation focuses

---

[3] As a refresher, finding of fact 13 and conclusion of law 5 are as follows:

> The information was conveyed to the defendant in a manner sufficient to allow the defendant to make a decision, the defendant made that decision, and did not leave and therefore was a violation of that order.

CP at 12 (FF 13).

> The defendant was aware of a valid anti-harassment order which restricted her from being at the property and she made the decision not to leave the property in violation of that order.

CP at 12 (CL 5).

on the exclusion of the respondent "from a residence, workplace, school, or day care" of the petitioner. RCW 7.105.455(2)(b).

"When a law enforcement officer investigates . . . an alleged violation of" an anti-harassment order, the officer must "attempt to determine whether *the respondent knew of the existence of the . . . order*." RCW 7.105.465(2) (emphasis added). And "[*i*]*f* the law enforcement officer determines that the respondent *did not, or probably did not, know about the . . . order* and the officer is provided a current copy of the order, the officer shall serve the order on the respondent" if they are present. *Id.* (emphasis added). "After the officer has served the order on the respondent, the officer shall enforce prospective compliance with the order." *Id.*

While the provisions governing the enforcement of protection orders discuss service on the respondent prior to enforcement, courts have held such requirement unnecessary so long as the defendant had knowledge of the order. *City of Auburn v. Solis-Marcial*, 119 Wn. App. 398, 402-403, 79 P.3d 1174 (2003) (interpreting former RCW 26.50.115, the statute governing enforcement of domestic violence protection orders under the Domestic Violence Protection Act); *State v. Sanchez*, 30 Wn. App. 2d 402, 407-08, 544 P.3d 1107 (2024) (explaining that a defendant may still be guilty of a felony violation of a protection order even when they were "not advised of the specific terms of the order," so long as the defendant had "knowledge of the no-contact order, and [they knew] that their willful conduct violated the no-contact order" (emphasis omitted.)).

In *Solis-Marcial*, the defendant was charged with violating a permanent protection order. 119 Wn. App. at 399-400. Olson, Solis-Marcial's ex-girlfriend, obtained a temporary protection order. *Id.* at 399. "Solis-Marcial was personally served with the protection order and with the notice of the hearing on the permanent order." *Id.* at 399-400. Solis-Marcial did not appear at the

hearing, and "[h]e was not personally served with the permanent order" until after the alleged violation. *Id.* at 400.

Prior to the violation, Solis-Marcial "filed his own petition for a protection order against Olson." *Id.* Both parties appeared at the hearing, and "[t]he court denied Solis-Marcial's petition." *Id.* The court "offered to grant Olson a protection order," but "Olson allegedly stated that she already had a protection order against Solis-Marcial." *Id.* Afterward, Solis-Marcial violated the terms of the permanent order by going "to Olson's residence," and was subsequently charged. *Id.*

Solis-Marcial argued that he could not have violated the permanent order "because he had not been personally served with the permanent order and the time of its violation." *Id.* The municipal court overseeing the violation agreed and dismissed the charge. *Id.* The King County Superior Court affirmed, and the City petitioned for review before the court of appeals. *Id.*

Division One of this court reversed. *Id.* at 400-04. The court observed that the relevant provisions governing the protection order against Solis-Marcial made "clear that a protection order is enforceable *so long as the person restrained knows of the order.*" *Id.* at 401 (emphasis added). In doing so, the court acknowledged that mandating "personal service as a further requirement of the offense of violation of a protection order would undermine the legislative intent by creating an incentive for domestic violence perpetrators to avoid court appearances and . . . personal service." *Id.* at 403.

Although *Solis-Marcial* dealt with a domestic violence protection order under the Domestic Violence Protection Act, the same principles underlying the *Solis-Marcial* court's decision apply here. There is a striking similarity between the provisions at issue in this case and the provisions discussed in *Solis-Marcial*. *Compare* RCW 7.105.455, .465, *with Solis-Marcial*, 119 Wn. App. at 400-02.

For example, RCW 7.105.465 conditions service on the defendant's knowledge of the order. The provision explains that "[*i*]*f* the law enforcement officer determines that the respondent *did not, or probably did not, know about the protection order.* . . the officer [must] serve the order on the respondent" if they are present. RCW 7.105.465(2) (emphasis added); *Solis-Marcial*, 119 Wn. App, at 402. Similarly, RCW 7.105.455(2)(b) explains that a defendant "may not be subjected to the penalties . . . for a violation of the order" but conditions that possibility on the *defendant not having knowledge of the order*. RCW 7.105.465(1); RCW 7.105.455(2)(b); *Solis-Marcial*, 119 Wn. App. at 402.[4]

With this understanding, personal service is not required for enforcement of the anti-harassment protection order when a defendant had knowledge of the order. Consequently, as provided by *Sanchez*, we consider (1) whether a defendant had knowledge of the order, and (2) whether the defendant knew that their willful conduct violated the order. *Sanchez*, 30 Wn. App. 2d at 406.[5]

There is no dispute that Stolaroff was not served with the temporary anti-harassment order prior to April 2. *Contra Solis-Marcial*, 119 Wn. App. at 399-400. Nevertheless, when viewing the evidence in the light most favorable to the State, sufficient evidence supports both *Sanchez* elements.

---

[4] The provision discussed in *Solis-Marcial* is most akin to RCW 7.105.465(1), but RCW 7.105.455(1) has nearly identical language to RCW 7.105.465(1).

[5] Stolaroff attempts to distinguish both *Solis-Marcial* and *Sanchez* based on the fact that both cases considered domestic violence protection orders under the Domestic Violence Protection Act. *See Solis-Marcial*, 119 Wn. App. at 399; *Sanchez*, 30 Wn. App. 2d at 406-07. We are unpersuaded by this distinction. As previously discussed, the language of the provisions considered by the court in *Solis-Marcial* are nearly identical to the provisions at issue in this case. *Compare* RCW 7.105.455, .465, *with Solis-Marcial*, 119 Wn. App. at 400-02. And independent of *Solis-Marcial* and *Sanchez*, the language of RCW 7.105.455 and .465 conditions enforcement on the defendant's knowledge of the order, not personal service.

First, comments Stolaroff made on the April 2 incident suggest that she knew of the temporary anti-harassment order. The trial court found in finding of fact 11 that when talking with Zimmerman, Stolaroff said "that she had not been notified by the Court of the Order," but she contradicted herself by stating that "*she had 15 days to respond to the Order and did not have to abide by the parameters for those 15 days until the court date.*" RP at 70 (emphasis added). Stolaroff's latter statement evidences some independent knowledge of the temporary anti-harassment protection order because Zimmerman did not relay this information to Stolaroff. The trial court similarly found that Stolaroff "was aware that there was some kind of order but she didn't believe that it was in place yet because there was some kind of court date that had yet to take place." CP at 11 (FF 11). Again, this shows that Stolaroff had independent knowledge of the temporary anti-harassment protection order because Zimmerman also did not relay this information to Stolaroff.

Stolaroff does not challenge finding of fact 11. Because of this, the court's finding that Stolaroff knew of the existence of an order is a verity on appeal. *A.M.*, 163 Wn. App. at 419. Moreover, as illustrated by the State, "Stolaroff's knowledge is evidenced by the fact that she argued with . . . Zimmerman about when the provisions of the order would go into effect." Br. of Resp't at 14.

Even if we were to conclude that this remark was insufficient to establish knowledge, other facts support that Stolaroff had knowledge of the anti-harassment protection order by the time of her arrest. When talking with Stolaroff, Zimmerman explained that he had an anti-harassment "[o]rder issued by the Court" and "that she could not be at [the Kary] residence." RP at 70. And the trial court found in finding of fact 12 that Zimmerman "conveyed some of the terms of the order to" Stolaroff, including "a distance no contact provision with [Mrs. Kary], that [Stolaroff]

12

could not be at [Mrs. Kary's] residence, and that it was a court order." CP at 11 (FF 12). After Stolaroff claimed that she did not have to abide by the temporary order, Zimmerman emphasized that she had to comply with the "parameters set forth in the Order until the hearing date." RP at 70.

Stolaroff also does not challenge finding of fact 12, meaning the fact that Zimmerman conveyed the relevant provisions of the anti-harassment order is a verity on appeal. *A.M.*, 163 Wn. App. at 419. This, in addition to the other facts before us, supports that Stolaroff had knowledge of the order.[6]

Second, Stolaroff understood that her conduct violated the order. Since 2016, there have been several occasions where Stolaroff broke into the hut. And during this period, Stolaroff has repeatedly been removed from the Karys' property, even being forcibly removed and taken to the street in one instance. Furthermore, law enforcement has been involved on prior occasions. For example, Zimmerman testified at trial that Ms. Kary had "called a number of times regarding issues she's had with . . . Stolaroff." RP at 66. In light of Stolaroff's knowledge of the order and her background with the Karys, the evidence supports that Stolaroff understood her conduct violated the anti-harassment protection order.

---

[6] As previously discussed, a defendant need not be advised of a specific terms of a protection order to be found guilty of violating the order if they had knowledge of the order. *Sanchez*, 30 Wn. App. 2d at 407-08. Although there is some conflicting evidence in the record about whether Stolaroff was specifically advised that she could not be within 1,000 feet of Mrs. Kary and her residence, Stolaroff's comments support that she knew there was a temporary anti-harassment protection order in place, and Stolaroff also knew that she was not permitted to be at the Karys' residence.

Stolaroff willfully entering the hut with the knowledge that she was not allowed to be there was sufficient to constitute a violation.[7]  And it was apparent that her conduct was in fact willful. Stolaroff locked herself in the hut and refused to come out, ultimately requiring Ron Kary Jr. to drill the lock out of the door.  Then, Zimmerman and Eaton had to physically remove Stolaroff from the hut.

Just as in *Solis-Marcial*, requiring personal service of a protection order as a prerequisite to enforcement would prove to be problematic in this case.  119 Wn. App. at 403.  Requiring personal service even when a defendant has knowledge of an order incentivizes conduct like Stolaroff's.

Therefore, we conclude that substantial evidence supports finding of fact 13.  This finding, along with findings of fact 11 and 12, support the trial court's conclusion in conclusion of law 5 that Stolaroff "was aware of a valid anti-harassment order which restricted her from being at the property and she made the decision not to leave the property in violation of the order."  CP at 12 (CL 5).  Accordingly, when viewing the evidence in the light most favorable to the State, a rational trier of fact could have found Stolaroff guilty of violating the anti-harassment order beyond a reasonable doubt, and sufficient evidence supports her conviction.

---

[7] In her reply brief, Stolaroff claims that there is "no factual basis . . . that . . . Stolaroff should have known what [Eaton and Zimmerman] were telling her as they tried to remove from the [hut] was true and accurate."  Reply Br. at 11.  This ignores the fact that Stolaroff herself acknowledged the existence of an order.

B.      Burglary in the Second Degree

Stolaroff also argues that insufficient evidence supports her conviction for burglary in the second degree. Stolaroff challenges findings of fact 2, 4, and 5, arguing that these, too, were erroneous.[8] We disagree.[9]

"A person is guilty of burglary in the second degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030(1). The elements of burglary in the second degree "are (1) entering *or remaining unlawfully* in a building other than a vehicle or dwelling[, and] (2) with the intent to commit a crime against a person or property therein." *State v. Brown*, 25 Wn. App. 2d 634, 640, 528 P.3d 370 (2023) (emphasis added).

---

[8] Findings of fact 2, 4, and 5 are as follows:

> 2. The defendant entered or remained unlawfully in the building. Multiple individuals testified that she had been removed prior and she acknowledged that she did not have the right to be there. Even if she had entered legally, she certainly remained unlawfully in the building.

> 4. As to the issue of the electricity, hooking up the extension cord to the home and bringing in the electricity to the building, the Court did find sufficient evidence that the extension cord and use of the power was the theft of services.

> 5. It is clear that the extension cord was not placed there by the home owner. And, of course that wouldn't make sense because they could just switch on the power at the breaker to get power to that unit.

CP at 9-10 (FF 2, 4, 5).

[9] Stolaroff dedicates a portion of her opening brief discussing the sufficiency of the charging document at our commissioner's request, ultimately concluding that the charging document was sufficient. The State agrees with Stolaroff's analysis. In light of this, we do not address this issue and focus only on whether sufficient evidence supported Stolaroff's conviction for burglary in the second degree.

Here, Stolaroff only disputes the second element, arguing that she did not enter with the intent to commit a crime. But when viewing the evidence in the light most favorable to the State, there is sufficient evidence to support this element.

As a preliminary matter, Stolaroff appears to confuse the element at issue. Stolaroff claims that she *did not unlawfully enter* the hut to commit a crime, but burglary in the second degree can be committed by either unlawful entry or *remaining unlawfully* in a building. RCW 9A.52.030(1); *Brown*, 25 Wn. App. 2d at 640. Even if it were the case that Stolaroff lawfully entered the hut, she certainly remained unlawfully in the hut based on the evidence.

Next, Stolaroff claims that there is little to no evidence illustrating that she intended to commit the crime of theft of services (electricity). This argument ignores the obvious inferences that can be drawn from the evidence.[10]

Mrs. Kary testified at trial that when Stolaroff had broken into the hut on previous occasions, Stolaroff used the heater. It was for this very reason that the Karys turned the power off to the hut by flipping the breaker before the incident leading to Stolaroff's arrest. And Mrs. Kary and Eaton found an extension cord connected to Mrs. Karys house that ran to the hut. Mrs. Kary did not plug in the extension cord, nor did she know who plugged in the cord.

In light of Stolaroff's unlawful use of the hut in the past, the evidence strongly supports the inference that Stolaroff plugged in the extension cord so she could use the heater. As the trial court observed, it would not make sense that the Karys plugged in the extension cord. If the Karys wanted to have power in the hut, they could simply flip the breaker. Stolaroff, who did not have

---

[10] Stolaroff cites to *State v. Carter*, 5 Wn. App. 802, 490 P.2d 1346 (1972), for the proposition that a conviction cannot be based on speculation or conjecture. Notably, *Carter* does not address a sufficiency of the evidence challenge, so the case is inapplicable. 5 Wn. App. at 802-08. This argument also fails to account for more recent cases that allow for inferences to be drawn from the evidence presented at trial. *See, e.g., Arntsen*, 2 Wn.3d at 724.

16

access to the breaker, would be the only person that would plausibly have a motive to use alternative means to get power to the hut. And, although obvious, it is beyond coincidental that Mrs. Kary found an extension cord connected to the hut on the same day that she observed Stolaroff on her property.

The evidence also supports the inference that Stolaroff intended to utilize the extension cord for the heater. Again, Stolaroff historically used the heater when staying in the hut.

The absence of the fact that Stolaroff used the heater is not dispositive. In *State v. Kolisynk*, 49 Wn. App. 890, 891, 746 P.2d 1224 (1987), for example, a defendant was convicted of burglary in the second degree for attempting to steal gasoline from a service station. Kolisynk was ultimately unsuccessful in obtaining any gasoline before the officers arrived, but he had "forcibly entered the gas station in an attempt to find the master switch that would activate the gas pumps located outside the building." *Id.*

On appeal, Kolisynk argued that he could not be guilty of burglary in the second degree because he did not unlawfully enter the gas station with the intent to commit a crime. *Id.* Division One of this court disagreed. *Id.* at 893-94. The court observed that "electricity is property that can be stolen" in the context of theft. *Id.* at 893. And despite the fact that Kolisynk never obtained gasoline, let alone the master key to turn on the gasoline pumps, sufficient evidence supported his conviction. *Id.* at 893-94. In other words, simply intending to turn on the power to the gasoline pumps was enough to maintain Kolisynk's conviction. *See id.*

Here, there is no actual evidence that Stolaroff used the heater. But like *Kolisynk*, the State did not have to prove that Stolaroff actually stole electricity, only that she had the intent to do so. *See id.* The evidence strongly supports the inference Stolaroff plugged in the extension cord for the purpose of using the heater while she remained unlawfully in the hut, meaning that she intended to commit the crime of theft of services by appropriating electricity from the Karys' residence. This is sufficient to establish guilt of burglary in the second degree.

Therefore, we conclude that substantial evidence supports findings of fact 2, 4, and 5. These findings support the trial court's conclusion that "Stolaroff entered or remained unlawfully in [the hut] on [Mrs. Kary's] property with the intent to commit a crime therein; theft of services." CP at 12 (CL 4). When viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Stolaroff was guilty of burglary in the second degree, and sufficient evidence supports her conviction.[11]

CONCLUSION

Accordingly, we affirm Stolaroff's convictions.

---

[11] In its brief, the State argues that it did not have to prove that Stolaroff had the intent to commit a crime when unlawfully entering and/or remaining in the hut. The State relies on *State v. Bennett*, 20 Wn. App. 783, 789, 582 P.2d 569 (1978), for the proposition that once it establishes that the defendant unlawfully entered and/or remained in a building, the defendant then has the burden to establish they did not have the intent to commit a crime. We need not address this argument because we conclude that the State presented sufficient evidence for any trier of fact to conclude beyond a reasonable doubt that Stolaroff unlawfully remained in the hut with the intent to commit a crime—namely, theft of services.

18

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, A.C.J.

We concur:

_____
Lee, J.

_____
Glasgow, J.